**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

THOSE CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON, subscribing to Policy
Nos. SUA WS20318-2103, SUA WS20318-
2002, and SUA WS20318-1901, AND
MARKEL INTERNATIONAL INSURANCE
COMPANY LIMITED,

     Plaintiffs,

 v.

AUTOMOBILE ACCEPTANCE
CORPORATION INC AND EUGENE
JEROME NICHOLS, individually and as class
representative,

     Defendants.

Case No. 2:23-cv-2030

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, Those Certain Underwriters at Lloyd's, London subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-19012 ("Underwriters") and Markel International Insurance Company ("Markel") (collectively, "Plaintiffs") allege the following for their Complaint for Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57:

## INTRODUCTION

1.  This action involves an insurance coverage dispute arising out of an underlying class action counterclaim against Defendant Automobile Acceptance Corp. ("AAC"), which was filed on April 14, 2016. The class action counterclaim seeks damages from AAC in connection with alleged non-compliant pre- and post-sale notices that allegedly resulted in wrongful repossession of vehicles and wrongful reporting of derogatory information to credit reporting agencies. Plaintiffs seek a determination that they have no duty to defend or indemnify AAC under

their claims made policies in connection with the lawsuit styled *Automobile Acceptance Corporation v. Eugene Jerome Nichols*, which is proceeding in Clay County Circuit Court as Case No. 15CY-CV07631-01 (the "Underlying Lawsuit").  Among other reasons, Plaintiffs seek this determination on the basis that there is no claim that was first made during any of Plaintiffs' policy periods.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiffs, Those Certain Underwriters at Lloyd's, London which subscribe to Policy Number SUA WS20318-2103, consist of sole member Syndicate CSL 1084[1] whose sole corporate member is a foreign company with its principal place of business in London, England and is organized under the laws of the United Kingdom.

3.      Plaintiff, Markel International Insurance Company Limited, which also subscribes to Policy Number SUA WS20318-2103, is a foreign company whose sole corporate member is a foreign company with its principal place of business in London, England and is organized under the laws of the United Kingdom.[2]

4.      Plaintiffs, Those Certain Underwriters at Lloyd's, London which subscribe to Policy Numbers SUA WS20318-2002 and SUA WS20318-19012 consist of sole member Syndicates CSL 1084[3] and MKL 3000[4] whose corporate members are foreign companies with

---

[1]  Syndicate CSL 1084 is otherwise referred to as Chaucer Corporate Capital (No.3) Limited and has 82.5% of the security for Policy No. SUA WS20318-2103.

[2]  Markel International Insurance Company Limited has 17.5% of the security for Policy No. SUA WS20318-2103.

[3]  Syndicate CSL 1084 has 82.5% of the security for Policy Nos. SUA WS20318-2002 and SUA WS20318-19012.

[4]  Syndicate MKL 3000 is otherwise referred to as Markel Capital Limited and has 17.5% of the security for Policy Nos. SUA WS20318-2002 and SUA WS20318-19012.

principal places of business in London, England and are organized under the laws of the United Kingdom.

5.      At all relevant times, AAC was a Kansas corporation that has its principal place of business in Kansas City, Kansas.

6.      Eugene Jerome Nichols ("Nichols") is currently a Kansas citizen who is domiciled in Overland Park, Johnson County, Kansas.

7.      This Court has subject matter jurisdiction of this controversy pursuant to 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 2201 because this is a declaratory judgment action wherein there is complete diversity of citizenship between the domestic and foreign parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Each of the policies at issue has limits of insurance of $1 million per claim and $2 million in the aggregate; among other damages, the class seeks no less than the minimum statutory damages under Mo. Rev. Stat. § 400.9-625 (*i.e.*, $500), and the underlying trial court certified the class on record evidence that there were hundreds, if not thousands, of class members.[5]

8.      This Court has personal jurisdiction over AAC and Nichols because they are Kansas citizens, they entered into the automobile loan that is the subject of the Underlying Lawsuit in Kansas, and decisions made about pre- and post-sale notices and repossession were made in Kansas.

9.      Venue is proper in the Kansas City division of the District of Kansas pursuant to 28 U.S.C. § 1391(b)(1) in that all defendants are residents of this State and reside in this district.

---

[5] The "net potential Missouri class" allegedly includes between 277 and 431 class members.

## FACTUAL BACKGROUND

### I.    The Underlying Lawsuit

10.    AAC filed a Petition for Deficiency Balance against Nichols in the Circuit Court of Jackson County, Missouri, Associate Division, Case No. 1516-CV10902, on or about May 22, 2015.  A copy of the Petition is attached hereto as **EXHIBIT A**.

11.    Following a transfer of venue to Clay County, Nichols filed an Answer and Counterclaim on or about April 14, 2016 in Case No. 15CY-CV07631[6].  A copy of the Answer and Counterclaim is attached hereto as **Exhibit B**.

12.    The initial version of the Counterclaim as filed on April 14, 2016 alleged the following to describe the nature of the case:

> 1.    Automobile Acceptance Corp. wrongfully accelerated Nichols' loan with Automobile Acceptance Corp. and wrongfully repossessed the collateral because Automobile Acceptance Corp. either failed to send the right to cure notice required by section 408.554 or sent a defective right to cure notice before repossession.
>
> 2.    Automobile Acceptance Corp. violated section 408.553 by charging interest during the time after Nichols' alleged default and before Automobile Acceptance Corp. obtained a deficiency judgment.
>
> 3.    Automobile Acceptance Corp. failed to send or sent Nichols a presale notice, which did not comply with the Uniform Commercial Code ("UCC") adopted by Missouri.
>
> 4.    Automobile Acceptance Corp. failed to send or sent Nichols a post-sale notice, which did not comply with the UCC.
>
> 5.    Nichols seeks actual damages not less than the statutory minimum provided under the UCC, and such other further relief as this Court may deem appropriate.

(Ex. B at ¶¶ 1–5).

---

[6] Case No. 15CY-CV07631 is the initial iteration of the Underlying Lawsuit.  References to pleadings filed under this case number shall also considered to be pleadings that form part of the Underlying Lawsuit.

13.     Nichols alleged that AAC had wrongfully collected or attempted to wrongfully collect a deficiency balance and other charges and further alleged that AAC had wrongfully reported derogatory information to local and national consumer reporting agencies.  (Ex. B at ¶¶ 32–34).

14.     Nichols prayed for (a) actual damages not less than the minimum damages provided by Mo. Rev. Stat. § 400.9-625(c)(2); (b) statutory damages of $500 for each defective post-sale notice that AAC sent or failed to send; (c) pre- and post-judgment interest; (d) punitive damages; (e) attorneys' fees; and (f) a declaration that the right to cure notice and pre- and post-sale notices failed to comport with statutory requirements.  (Ex. B at pp. 10–11).

15.     On June 1, 2016, AAC filed an Amended Petition for Deficiency Balance ("Amended Petition") in the Underlying Lawsuit.  A copy of the Amended Petition is attached hereto as **EXHIBIT C**.

16.     On June 2, 2016, Nichols filed an Answer and Counterclaim to the Amended Petition and a Motion to Dismiss the Amended Petition.  A copy of the Answer and Counterclaim is attached hereto as **EXHIBIT D**.

17.     Following the underlying trial court's denial of the Motion to Dismiss the Amended Petition on August 5, 2016, Nichols filed a First Amended Answer and Counterclaim to the Amended Petition (the "Class Counterclaim") on August 8, 2016.  Nichols pled class claims in this First Amended Answer and Counterclaim.  A copy of the First Amended Answer and Counterclaim is attached hereto as **EXHIBIT E**.

18.     The Class Counterclaim alleged the following to describe the nature of the case:

1.     This is a consumer class action against Automobile Acceptance Corp. ("AAC"), and its predecessors and successors, seeking relief to redress an unlawful and deceptive pattern of wrongdoing followed by AAC regarding collection, enforcement, repossession and disposition of collateral, and collection

of alleged deficiencies.

2.      AAC violated section 408.553 by charging interest during the time after Nichols' and numerous other Missouri consumers' alleged defaults and before AAC obtained deficiency judgments against them.

3.      AAC sent Nichols and many other consumers a presale notice, which did not comply with the Uniform Commercial Code ("UCC") adopted by each state.[]  AAC's form presale notice is attached to AAC's Amended Petition with the title "Notice of Repossession and Intent to Sell or Dispose of Collateral."

4.      AAC sent Nichols and numerous other consumers a post-sale notice, which did not comply with the UCC.  AAC's form post-sale notice is attached to AAC's Amended Petition with the title "Notice of Sale of Collateral and Deficiency (or Surplus Due)."

5.      Nichols sues individually and for all other similarly situated consumers.  They seek actual damages not less than the statutory minimum provided for under the UCC, and for such other further relief as this Court may deem appropriate.

(Ex. E at ¶¶ 1–5).

19.    Nichols alleged the class members to be the following persons:

… all persons ("Class") within the applicable statute of limitations:

a. who are named as borrowers or buyers on a loan or financing agreement with AAC, assigned to AAC or owned by AAC;

b. whose loan or financing agreement was secured by collateral;

c. whose collateral was repossessed, voluntarily or involuntarily; and

d. whose collateral was disposed.

(Ex. E at ¶ 39).

20.    In the alternative, Nichols alleged the class members to be the following persons:

… all persons ("Class") within the applicable statute of limitations:

a. who AAC failed to send a presale notice;

b. who AAC sent a presale notice with one of the alleged defects in the presale notice sent to Nichols.

(Ex. E at ¶ 40).

21.     Nichols alleged the Missouri Subclass to include the following persons:

… all persons within the Class ("Missouri Subclass"):

> a.  who obtained a Missouri Certificate of Title for a motor vehicle identifying AAC as the lienholder, or who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with AAC, assigned to AAC or owned by AAC;
>
> b.  whose loan or financing agreement was secured by a motor vehicle or other collateral;
>
> c.  whose motor vehicle or other collateral was repossessed, involuntarily or voluntarily; and
>
> d.  whose motor vehicle or other collateral was disposed.

(Ex. E at ¶ 41).

22.     In the alternative, Nichols alleged the Missouri Subclass to include the following persons:

> … all persons within the Class ("Missouri Subclass") who obtained a Missouri Certificate of Title for a motor vehicle identifying AAC as the lienholder, or who are named as borrowers or buyers with a Missouri address on a loan or financing agreement with AAC, assigned to AAC or owned by AAC; and:
>
> a.  who AAC failed to send a presale notice;
>
> c.  who AAC sent a presale notice with one of the alleged defects in the presale notice sent to Nichols;[7]
>
> d.  who AAC failed to send a post-sale notice; or
>
> e.  who AAC sent a post-sale notice after disposing the collateral or receiving insurance proceeds for the same.

(Ex. E at ¶ 42).

23.     Among other things, Nichols alleged that "Nichols' claims are typical of the claims of the class members" and that "Nichols' and the classes' claims are based on the same factual and

---

[7] There is no sub-paragraph b in Paragraph 42 of the Class Counterclaim.

legal theories."  (Ex. E at ¶¶ 47-48).

24.     In this regard, Nichols alleged on behalf of himself and the proposed class that AAC had wrongfully collected or attempted to wrongfully collect a deficiency balance, interest, and other charges and further alleged that AAC had wrongfully reported derogatory information to local and national consumer reporting agencies.  (Ex. E at ¶¶ 31–34).

25.     Nichols alleged on behalf of himself and the proposed class that "AAC's actions were wanton, outrageous, and/or malicious because of its reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass."  (Ex. E at ¶ 88).

26.     The Class Counterclaim pled two claims:  Count I – Class's Claim and Count II – Missouri Subclass' Claim.  (Ex. E at pp. 12–16).

27.     Nichols and the "Class" prayed for the following damages in connection with Count I:

a. … actual damages not less than the minimum damages provided by § 9-625(c)(2);

b. statutory damages of $500 for each defective post-sale notice sent or that AAC failed to send;

c. prejudgment and post-judgment interest;

d. a preliminary and permanent injunction enjoining AAC from engaging in the practices alleged, including without limitation, enjoining AAC from collecting deficiency judgments, time price differential, delinquency and collection charges from Nichols and the Class;

e. a mandatory injunction compelling AAC to return any money collected for deficiency judgments, time price differential, delinquency and collection charges from Nichols and the Class;

f. a mandatory injunction compelling AAC to remove any adverse credit information wrongfully reported on Nichols' and the Class' consumer credit reports;

g. a declaration that the presale and post-sale notices sent by AAC to Nichols and the Class fail to comport with the statutory requirements; and

h. for such other and further relief as this Court deems just and proper.

(Ex. E at pp. 13–14).

28.     Nichols alleged actual damages pursuant to § 9-625(c), which included the following:

a. loss of use of tangible property and cost of alternative transportation;

b. loss resulting from the inability to obtain, or increased costs of, alternative financing;

c. harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

d. harm caused by defamation, slander and libel;

e. harm caused by invasion of privacy; and

f. other uncertain and hard-to-quantify actual damages.

(Ex. E at ¶ 75).

29.     Nichols and the "Missouri Subclass" prayed for the following damages in connection with Count II:

a. … actual damages not less than the minimum damages provided by RSMo § 400.9-625(c)(2);

b. statutory damages of $500 for each defective post-sale notice sent;

c. prejudgment and post-judgment interest;

d. attorney's fees;

e. punitive damages;

f. a preliminary and permanent injunction enjoining AAC from engaging in the practices alleged, including without limitation, enjoining AAC from collecting deficiency judgments, time price differential, delinquency and collection charges from Nichols and the Missouri Subclass;

g. a mandatory injunction compelling AAC to return any money collected for deficiency judgments, time price differential, delinquency and collection charges from Nichols and the Missouri Subclass;

h. a mandatory injunction compelling AAC to remove any adverse credit

information wrongfully reported on Nichols' and the Missouri Subclass's consumer credit reports;

i. a declaration that the right cure, presale, and post-sale notices sent by AAC to Nichols and the Missouri Subclass fail to comport with the statutory requirements; and

j. for such other and further relief as this Court deems just and proper.

(Ex. E at pp. 16–17 & ¶¶ 86–87).

30.     Nichols alleged actual damages pursuant to § 400.9-625(c)(2), which included the following:

a. loss of use of tangible property and cost of alternative transportation;

b. loss resulting from the inability to obtain, or increased costs of, alternative financing;

c. the surplus after disposition of the collateral that would be equal to the proceeds of disposition less the unaccelerated balance due on the consumer loan contracts and less any wrongfully charged interest;

d. all monies paid to AAC by Nichols and the Missouri Subclass for the time price differential and delinquency and collection charges on the consumer credit contracts;

e. harm to credit worthiness, credit standing, credit capacity, character, and general reputation;

f. harm caused by defamation, slander and libel;

g. harm caused by invasion of privacy; and

h. other uncertain and hard-to-quantify actual damages.

(Ex. E at ¶ 84).

31.     AAC filed its Answer to the Class Counterclaim on September 16, 2016.  A copy of AAC's Answer to the Class Counterclaim is attached hereto as **EXHIBIT F**.

32.     On August 9, 2022, the underlying trial court granted class certification in the Underlying Lawsuit.  (Docket, attached as **EXHIBIT G**).

33.     On September 30, 2022, the underlying trial court issued its Order for Class

Certification in the Underlying Lawsuit (the "Class Certification Order").  A copy of the Class Certification Order is attached hereto as **EXHIBIT H**.

34.    The Class Certification Order referred to Nichols "assert[ing] counterclaims on behalf of himself and all persons similarly situated and seeking to certify the action as a class action under Rule 52.08 MRCP" in his August 8, 2016 First Amended Answer and Counterclaim. (Ex. H at p. 2).

35.    The Class Certification Order stated with respect to typicality that Nichols " 'possess[es] the same interest and suffer[ed] the same injury as the class members' " and that "Nichols' claims arise from the same event or course of conduct of AAC affecting the potential class members…"  (Ex. H at p. 10).

36.    The Class Certification Order also stated that "Nichols and the class seek the same form of relief for the same alleged conduct."  (Ex. H at p. 12).

37.    Further, the Class Certification Order stated with respect to numerosity:

… The record shows the potential class members will number at least in the hundreds and there is significant likelihood that the class could be in the thousands. … Plaintiff in its brief submitted the affidavit and statistical report[] of its expert, Peter Karutz.  The report identified review of both a large and small statistical sample of AAC customer accounts and identified different "net potential Missouri Class" member sets of 277 and 431. … Although the parties disagree on the exact number of class members, they do agree the class at least numbers in the hundreds. …

(Ex. H at pp. 7–8).

38.    On October 3, 2022, the underlying trial court entered an Amended Order for Class Certification ("Amended Class Certification Order").  A copy of the Amended Class Certification Order is attached as **EXHIBIT I**.

39.    On December 15, 2022, AAC and Nichols filed a Joint Motion Regarding Class Certification Without Waiver seeking to correct the description of the persons in the Amended

Class Certification Order that were excluded from the class.  AAC and Nichols stipulated to the following:

> 2. Nichols filed his class action counterclaim on August 8, 2016.  Six years prior to August 8, 2016 is August 8, 2010.

> 3. For purposes of this proceeding in accordance with the class certification order and generating the class list as provided on page 18 of the class certification order, the parties stipulate and agree to use August 8, 2019 as the relevant cutoff date, such that persons to whom AAC sent pre-sale or post-sale notices prior to August 8, 2010, are not included within the class definition.

A copy of the Joint Motion is attached hereto as **EXHIBIT J**.

## II.   Notice to Plaintiffs

40.     For the first time, AAC provided notice to Plaintiffs of the Underlying Lawsuit via e-mail to John Silk of Karbal, Cohen, Economou, Silk & Dunne, LLC dated December 15, 2022 (the "Notice").  The Notice attached a copy of the September 30, 2022 Class Certification Order (but not the amendment); a copy of the claim information from Auto-Owners Insurance Company describing the claim as "INSD SUED CUSTOMER FOR DEFINCIARY [sic] CLMT ATTY RESUEING [sic] AS CLASS ACTION SUIT;" and the August 8, 2016 notice of loss to Auto-Owners Insurance Company, which appended a non-file-stamped copy of the Class Counterclaim.  A copy of the Notice and attachments is attached as **EXHIBIT K**.

## III.   The Policies

41.     Plaintiffs issued a Mortgage Company Professional Liability policy bearing Certificate No. SUAWS20318-1901 to Named Insured Automobile Acceptance Corporation Inc for the policy period beginning March 1, 2019 and ending March 1, 2020 (the "2020 Policy"). (2020 Policy, attached as **EXHIBIT L**, at UND000007).  The 2020 Policy has limits of insurance of $1 million per claim and $2 million in the aggregate.  (*Id.*).

42.     Plaintiffs issued a Mortgage Company Professional Liability policy bearing

Certificate No. SUAWS20318-2002 to Named Insured Automobile Acceptance Corporation Inc for the policy period beginning March 1, 2020 and ending March 1, 2021 (the "2021 Policy"). (2021 Policy, attached as **Exhibit M**, at UND000059).  The 2021 Policy has limits of insurance of $1 million per claim and $2 million in the aggregate.  (*Id.*).

43.    Plaintiffs issued a Mortgage Company Professional Liability policy bearing Certificate No. SUAWS20318-2103 to Named Insured Automobile Acceptance Corporation Inc for the policy period beginning March 1, 2021 and ending March 1, 2023 (the "2022 Policy")[8], as modified by the ERP Endorsement.  (2022 Policy, attached as **Exhibit N**, at UND000108, UND000112).  The 2022 Policy has limits of insurance of $1 million per claim and $2 million in the aggregate.  (*See id.*).

44.    The 2020 Policy's and 2021 Policy's Insuring Agreements require a claim for a wrongful act to be first made during the policy period, per the following:

## I.      INSURING AGREEMENT

The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

(Ex. L at UND000009; Ex. M at UND000061).

45.    The 2022 Policy's Insuring Agreement, as modified by the ERP Endorsement, requires a claim for a wrongful act to be first made during the policy period, per the following:

## II.     INSURING AGREEMENT

The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 and before March 01, 2022.

---

[8] The 2020 Policy, 2021 Policy, and 2022 Policy shall be collectively referred to as the "Policies."

(Ex. N at UND000108).

46.      The Policies' Retroactive Date is March 1, 2019.  (Ex. L at UND000008; Ex. M at UND000060; Ex. N at UND000113).

47.      The Policies' Coverage Date is also March 1, 2019.  (Ex. L at UND000008; Ex. M at 000060; Ex. N at UND000113).

48.      The Policies define "loss" to mean the following:

… money damages, settlements, and **DEFENSE COSTS**.  **LOSS** shall not include:

1.      punitive or exemplary damages or the multiplied portion of a multiplied damages award;

2.      criminal or civil fines or penalties imposed by law;

3.      taxes;

4.      matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

(Ex. L at UND000010–11; Ex. M at UND000062–63; Ex. N at UND000115–16).

49.      The Policies define "claim" to mean "a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings."  (Ex. L at UND000011; Ex. M at UND000063; Ex. N at UND000116).

50.      The Policies define "policy period" to mean "the period from the inception date of this Policy to the expiration date stated in Item 2 of the Declarations, or to any earlier cancellation date of this Policy."  (Ex. L at UND000011; Ex. M at UND000063; Ex. N at UND000116).

51.      The Policies define a "wrongful act" as "any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations."   (Ex. L at UND000010; Ex. M at UND000062; Ex. N at

UND000115).

52. AAC's Profession, as set forth in Item 1.A. of the Declarations is "<u>AUTOMOBILE LOAN ORIGINATION; AUTOMOBILE LOAN SERVICING</u>."  (Ex. L at UND000008; Ex. M at 000060; Ex. N at UND000113).

53. AAC's application(s) for the Policies was/were material to Plaintiffs' agreement to underwrite the insured risk, per the following:

## VII.   GENERAL CONDITIONS

### A.   APPLICATION

By acceptance of this Policy, all **INSUREDS** agree as follows:

1.   The particulars and statements contained in the application, a copy of which is attached hereto, and any materials submitted therewith (which are on file with the Company and are deemed attached hereto, as if physically attached hereto) are true and are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

2.   the statements in the application and in any materials submitted therewith are the **INSUREDS'** representations and shall be deemed material to the acceptance of the risk or the hazard assumed by the Company under this Policy and this Policy is issued in reliance upon the truth of such representations;

3.   in the event the application, including materials submitted therewith, contains any misrepresentation made with the actual intent to deceive or contains any misrepresentation that materially affects either the acceptance of the risk or the hazard assumed by the Company under this Policy, this Policy shall be void in its entirety and of no effect whatsoever; and

4.   this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the **INSUREDS**.

(Ex. L at UND000021–22; Ex. M at UND000073–74; Ex. N at UND000126–27).

54. The Policies set forth the following with respect to AAC's duty to notify Plaintiffs

about a claim:

### VI.    NOTICE AND LOSS PROVISIONS

A.    As a condition precedent to the availability of the rights provided under this Policy, the **INSURED** shall give written notice to the Company of any **CLAIM** made against the **INSURED** as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** is first made.

* * *

C.    The notifications provided for above shall be made to the party set forth in Item 8[9] of the Declarations.

(Ex. L at UND000020–21; Ex. M at UND000072–73; Ex. N at UND000125–26).

55.    Section V – Limit of Liability and Retention of the Policies states, in part:

### C.    MULTIPLE INSUREDS, CLAIMS OR CLAIMANTS

The inclusion herein of more than one **INSURED** or the making of **CLAIM(S)** by more than one person or organization shall not operate to increase the Company's Limit of Liability. **CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made:

1.    when the earliest **CLAIM** within such single **CLAIM** was first made, or

2.    when notice was first given under any policy of insurance of any **WRONGFUL ACT** or any matter, fact, circumstance, situation, event or transaction that underlies any **CLAIM** within such single **CLAIM**,

and all such **CLAIM(S)** shall be subject to the same Limit of Liability.

(Ex. L at UND000019–20; Ex. M at UND000071–72; Ex. N at UND000124–25).

56.    The Policies define "interrelated wrongful acts" as "**WRONGFUL ACTS** that

have as a common nexus any fact, circumstance, situation, event or transaction or series of facts,

---

[9] The individual to be notified is an attorney with the law firm of Karbal, Cohen, Economou, Silk & Dunne, LLC.   (Ex. L at UND000007–8, 31; Ex. M at UND000059–60, 83; Ex. N at UND000116).

circumstances, situations, events or transactions." (Ex. L at UND000011; Ex. M at UND000063; Ex. N at UND000112–13, 136).

57.     The Policies exclude claims that were known to the insured and/or reported under prior years' policies, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

\*\*\*

O.     based upon or directly or indirectly arising out of or resulting from any actual or alleged:

1.     **WRONGFUL ACT** or matter, fact, circumstance, situation, event or transaction that has been the subject of any claim made prior to the inception of this Policy or of any notice given during any prior policy;

2.     **WRONGFUL ACT** which, together with a **WRONGFUL ACT** that has been the subject of any claim or notice identified in O.1. above, would constitute **INTERRELATED WRONGFUL ACTS**; or

3.     Matter, fact, circumstance, situation, event or transaction known to an **INSURED** prior to the Coverage Date set forth in Item 7 of the Declarations if such matter, fact or circumstance would cause a reasonable person to believe that a **CLAIM** for a **WRONGFUL ACT** may be made[.]

(Ex. L at UND000015–16; Ex. M at UND000067–68; Ex. N at UND000120–21).

58.     The Policies exclude claims for defamation and invading the right of privacy, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

\*\*\*

G.     based upon or directly or indirectly arising out of or resulting from any actual or alleged (1) false arrest, malicious prosecution, abuse of process, false detention or false imprisonment; (2) assault and battery; (3) libel, slander or defamation of character; (4) wrongful entry or eviction; or (5) invasion of any right of privacy[.]

(Ex. L at UND000014; Ex. M at UND000066; Ex. N at UND000119).

59.     The Policies exclude claims for non-monetary relief, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

\*\*\*

J.      seeking relief or redress in any form other than money damages including but not limited to **CLAIM(S)** for injunctive relief in any form whatsoever and including disciplinary proceedings[.]

(Ex. L at UND000014–15; Ex. M at UND000066–67; Ex. N at UND000119–20).

60.     The Policies exclude claims for personal profit, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

\*\*\*

A.      based upon or directly or indirectly arising out of or resulting from an **INSURED** gaining in fact any personal profit or advantage to which the **INSURED** is not legally entitled[.]

(Ex. L at UND000013; Ex. M at UND000065; Ex. N at UND000118).

61.     The Policies exclude claims arising from allegations of unfair competition, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

\*\*\*

M.      based upon or directly or indirectly arising out of or resulting from any actual or alleged unfair competition, interference with contract or violation of anti-trust laws[.]

(Ex. L at UND000015; Ex. M at UND000067; Ex. N at UND000120).

62.     The Policies exclude coverage if there is other valid insurance applicable to a claim, as set forth in the following exclusion:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

***

       N.    to the extent that there is coverage under any other existing valid policy or policies, whether such other insurance is stated to be contributory, excess, contingent or otherwise and regardless of whether or not such **LOSS** is collectible or recoverable under such other insurance; provided, however, that this exclusion shall not apply to any **LOSS** in excess of the retention and limit of liability of such other policy or policies where such **CLAIM** is otherwise covered under the terms of this Policy[.]

(Ex. L at UND000015; Ex. M at UND000067; Ex. N at UND000120).

      63.    The Policies exclude intentional or criminal acts, as set forth in the following exclusion, which states in part:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

***

       B.    that results in a judgment or final adjudication that any **INSURED** has committed any criminal, dishonest, intentionally malicious, or fraudulent act, error or omission.

(Ex. L at UND000013; Ex. M at UND000065; Ex. N at UND000118).

      64.    The Policies exclude claims for bodily and mental injuries and property damage, as set forth in the following exclusion, which states in part:

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

***

       C.    based upon or directly or indirectly arising out of or resulting from any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease, or death, including but not limited to loss of consortium or services, or any actual or alleged damage to or loss of or destruction of any tangible property, including loss of use thereof[.]

(Ex. L at UND000013; Ex. M at UND000065; Ex. N at UND000118).

      65.    The Policies exclude claims involving loan-related misrepresentations or falsities and improper fees, penalties, costs associated therewith, as set forth, in part, in the following

exclusion:

> This Policy does not apply to **LOSS** in connection with any **CLAIM**:
>
> ***
>
> BB.     based upon or directly or indirectly arising out of or resulting from any actual or alleged (1) non-disclosure, concealment, misrepresentation, misstatement or falsification of any terms of a loan, or of any rights or information required to be disclosed or revealed under TILA; or (2) improper, excessive, illegal, or unauthorized fees, penalties or costs, including but not limited to prepayment penalties. …

(Ex. L at UND000018; Ex. M at UND000070; Ex. N at UND000123).

66.     The 2020 Policy's Exclude Services Endorsement excludes certain professional services from coverage, as follows:

### EXCLUDE SERVICES ENDORSEMENT

To be attached to and form part of Policy Number: **SUAWS20318-1901**

In favor of: **AUTOMOBILE ACCEPTANCE CORPORATION INC CREDIT MOTORS**

In consideration of the premium charged, it is understood and agreed that the Policy does not apply to LOSS in connection with any CLAIM directly or indirectly based upon or arising out of or resulting from the providing of or failing to provide the professional services described below:

AUTOMOBILE SALES

REPOSSESSION SERVICES

The effective date of this endorsement is March 1, 2019.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

(Ex. L at UND000039).

67.     The 2021 Policy's Exclude Services Endorsement excludes certain professional services from coverage, as follows:

**EXCLUDE SERVICES ENDORSEMENT**

To be attached to and form part of Policy Number: **SUAWS20318-2002**

In favor of: **AUTOMOBILE ACCEPTANCE CORPORATION INC**

In consideration of the premium charged, it is understood and agreed that the Policy does not apply to LOSS in connection with any CLAIM directly or indirectly based upon or arising out of or resulting from the providing of or failing to provide the professional services described below:

AUTOMOBILE SALES

REPOSSESSION SERVICES

The effective date of this endorsement is March 1, 2020.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

(Ex. M at UND000091).

68.     The 2022 Policy's Exclude Services Endorsement excludes certain professional services from coverage, as follows:

**EXCLUDE SERVICES ENDORSEMENT**

To be attached to and form part of Policy Number: **SUAWS20318-2103**

In favor of: **AUTOMOBILE ACCEPTANCE CORPORATION INC**

In consideration of the premium charged, it is understood and agreed that the Policy does not apply to LOSS in connection with any CLAIM directly or indirectly based upon or arising out of or resulting from the providing of or failing to provide the professional services described below:

AUTOMOBILE SALES; REPOSSESSION SERVICES

The effective date of this endorsement is March 1, 2021.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

(Ex. N at UND000145).

**CHOICE OF LAW**

69.     The Policies were issued to a Kansas named insured because AAC is incorporated in and has its principal place of business in Kansas.

70.     The Policies were delivered to AAC in Kansas through the Al Janosik Insurance Agency in Topeka, Kansas.

**COUNT I: DECLARATORY JUDGMENT AGAINST DEFENDANTS (NO CLAIM DURING POLICY YEARS)**

71.     Plaintiffs incorporate by reference Paragraphs 1 through 70 as if fully set forth herein.

72.     The Insuring Agreement of the Policies is only triggered by a "Claim" first made during the "Policy Period" of any respective policy.

73.     Here, AAC first received notice of a lawsuit against it when Nichols filed a counterclaim against AAC in the Underlying Lawsuit on April 14, 2016.

74.     AAC's receipt of Nichols' Counterclaim on April 14, 2016 constituted a "Claim" under the Policies because the Counterclaim was a written demand for money damages, including a lawsuit against it.

75.     AAC also first received notice of a class action lawsuit against it when Nichols, individually and as class representative, filed the Class Counterclaim in the Underlying Lawsuit on August 8, 2016.

76.     AAC's receipt of the Class Counterclaim on August 8, 2016 also constituted a "Claim" under the Policies because the Counterclaim was a written demand for money damages, including a lawsuit against it.

77.     AAC recognized that a class action lawsuit had been filed against it on August 8, 2016 because it notified a separate insurance company—Auto-Owners Insurance Company—on

the same date that "[t]here was a mutual dismissal on the case [for the deficiency balance], then the claimant's attorney is resueing [sic] as a class action suit."

78.    April 14, 2016 is not within the policy periods of Plaintiffs' Policies because that date pre-dates the March 1, 2019 inception date of Plaintiffs' earliest policy year.

79.    August 8, 2016 is likewise not within the policy periods of Plaintiffs' Policies because that date also pre-dates the March 1, 2019 inception date of Plaintiffs' earliest policy year.

80.    The Class Certification Order, as amended or modified by the Amended Class Certification Order and/or the Joint Motion Regarding Class Certification Without Waiver, also did not result in any "Claim" being made against AAC within the "Policy Period" of any of the Policies.

81.    Even assuming, *arguendo*, the Class Certification Order did result in one or more "Claims" being made against AAC as defined by the Policies, such purported "Claim(s)" and Nichols' "Claim" would involve "Wrongful Acts" that share a common nexus of facts, circumstances, situations, events, or transactions, and therefore would involve "Interrelated Wrongful Acts" as defined by the Policies, which by operation of Section V.C. of the Policies would make Nichols' "Claim" and the class members' purported "Claim(s)" in the Class Certification Order a single "Claim" first made no later than August 8, 2016, the date when AAC received notice of the Class Counterclaim, and thus a "Claim" first made prior to the March 1, 2019 inception date of Plaintiffs' earliest policy year.

82.    Accordingly, there is no duty to defend or indemnify AAC in the Underlying Lawsuit under any of Plaintiffs' Policies because no "Claim" was first made during the "Policy Period" of any of Plaintiffs' Policies.

83.    For all the foregoing reasons, an actual controversy exists between Plaintiffs and

Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

### COUNT II: DECLARATORY JUDGMENT AGAINST DEFENDANTS ("LOSS")

84.     Plaintiffs incorporate by reference Paragraphs 1 through 83 as if fully set forth herein.

85.     Non-monetary damages are not a "loss" under the Policies.

86.     Punitive or exemplary damages are not a "loss" under the Policies.

87.     Civil fines or penalties imposed by law are not a "loss" under the Policies.

88.     The prayers for statutory damages, injunctive relief, declaratory relief, and punitive damages in the Underlying Lawsuit do not constitute a "loss" under the Policies.

89.     Accordingly, even if there were a "Claim" within Plaintiffs' policy periods, which Plaintiffs deny, Plaintiffs have no duty to indemnify AAC for these alleged categories of damages and equitable relief.

90.     For all the foregoing reasons, an actual controversy exists between Plaintiffs and Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

### COUNT III: DECLARATORY JUDGMENT AGAINST DEFENDANTS ("WRONGFUL ACT")

91.     Plaintiffs incorporate by reference Paragraphs 1 through 90 as if fully set forth herein.

92.     Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, any claim against AAC must allege that AAC committed a negligent act, negligent error, or negligent omission solely in the performance or failure to perform professional services for others with respect to automobile loan origination or automobile loan servicing.

93.     The Underlying Lawsuit does not allege claims against AAC in connection with automobile loan origination or automobile loan servicing.

94.     The allegations in the Underlying Lawsuit that AAC wrongfully repossessed, voluntarily or involuntarily, Nichols' and the class's vehicles and thereafter disposed of them do not involve the performance of or failure to perform automobile loan origination or automobile loan servicing.

95.     The Underlying Lawsuit also alleges that AAC's actions were not negligent but were "wanton, outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass."

96.     Additionally, the allegations in the Underlying Lawsuit that AAC engaged in slander, libel, and defamation are non-negligent, intentionally harmful acts.

97.     Accordingly, Plaintiffs have no duty to defend or indemnify AAC for any claims made by Nichols or the class members in the Underlying Lawsuit because the allegations against AAC do not involve actual or alleged negligent acts, negligent errors, or negligent omissions in the performance of or failure to perform automobile loan origination or automobile loan servicing.

98.     For all the foregoing reasons, an actual controversy exists between Plaintiffs and Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

## COUNT IV: DECLARATORY JUDGMENT AGAINST DEFENDANTS (RETROACTIVE DATE)

99.     Plaintiffs incorporate by reference Paragraphs 1 through 98 as if fully set forth herein.

100.     Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, any claim against AAC must involve an actual or alleged negligent act, negligent error, or negligent omission of AAC solely in the performance of or failure to perform professional services for others with respect to automobile loan origination or automobile loan servicing on or after the Policies' March 1, 2019 Retroactive Date in order to engage coverage under the Policies' Insuring

Agreements.

101.    Both the Counterclaim and Class Counterclaim were filed in 2016 and alleged, as of that date, that AAC had sent defective pre-and post-sale notices to Nichols and class members, and thus, necessarily, involved allegations of acts, errors or omissions by AAC prior to the Policies' March 1, 2019 Retroactive Date.

102.    Further, the Joint Motion Regarding Class Certification Without Waiver acknowledges that the claims for which AAC may be held liable in the Underlying Lawsuit are claims for acts or omissions that occurred between August 8, 2010 and August 8, 2016, which pre-date the Policies' March 1, 2019 Retroactive Date.

103.    Accordingly, Plaintiffs have no duty to defend or indemnify AAC for any claims made by Nichols or the class members in the Underlying Lawsuit, as such do not trigger coverage under the Policies' Insuring Agreements.

104.    For all the foregoing reasons, an actual controversy exists between Plaintiffs and Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

## COUNT V: DECLARATORY JUDGMENT AGAINST DEFENDANTS (EXCLUSIONS)

105.    Plaintiffs incorporate by reference Paragraphs 1 through 104 as if fully set forth herein.

106.    Exclusion N of the Policies excludes any claims against AAC in the Underlying Lawsuit for which AAC may be held liable because AAC had another valid policy with Auto-Owners Insurance Company that, upon information and belief, provides coverage to AAC for some or all of the claims in the Underlying Lawsuit.

107.    Exclusion O of the Policies excludes any claims against AAC in the Underlying Lawsuit for which AAC may be held liable because: (1) the claims of Nichols and the class involve

a "Wrongful Act," as defined by the Policies, or a matter, fact circumstance, situation, event or transaction that has been the subject of a claim made prior to the inception of the Policies; (2) AAC reported the Class Counterclaim to Auto-Owners Insurance Company in 2016, long before the first of the Policies incepted, and (3) AAC knew prior to the Policies' Coverage Date of March 1, 2019 of a matter, fact or circumstance that would cause a reasonable person to believe that a "Claim" for a "Wrongful Act" might be made: namely, a putative class action lawsuit that had been pending against AAC since 2016. The claims of Nichols and the class are therefore not a "fortuitous" loss under the Policies.

108. Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion G of the Policies excludes recovery for any allegations in the Underlying Lawsuit claiming harm caused by defamation, slander, libel, and/or invasion of privacy, including, but not limited to, harm to credit worthiness, credit standing, credit capacity, character, and general reputation, arising from alleged wrongful derogatory reports made to local and national credit reporting agencies.

109. Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion C of the Policies excludes recovery for any alleged damages in the Underlying Lawsuit arising from loss of use of tangible property.

110. Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion J of the Policies excludes the prayers for injunctive relief and declaratory relief because they seek relief or redress other than money damages.

111. Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion A of the Policies excludes the claims against AAC in the Underlying Lawsuit to the extent that it is determined that AAC gained any personal profit or advantage to which it was not

legally entitled.

112.    Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion B of the Policies excludes any judgment and the resulting damages that are based on acts that were "wanton, outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass."  This includes, but is not limited to, AAC's alleged unlawful repossession and sale of collateral without proper notices and AAC's alleged unlawful collection of judgments, interest, and fees from Nichols and the class.

113.    Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion M of the Policies excludes the claims against AAC in the Underlying Lawsuit to the extent that AAC is determined to have engaged in unfair competition because of its alleged "unlawful and deceptive" business practices.

114.    Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, Exclusion BB of the Policies excludes the claims against AAC in the Underlying Lawsuit to the extent that AAC misrepresented or misstated the terms of any loan and/or assessed improper, excessive, illegal, or unauthorized fees, penalties, or costs when AAC allegedly wrongfully accelerated Nichols' and the class's loans after allegedly failing to send compliant pre-sale notices; thereafter allegedly wrongfully repossessed and sold the vehicles that served as collateral; allegedly sent non-compliant post-sale notices; and allegedly wrongfully attempted to collect on deficiency balances, fees, and interest that Nichols and the class allegedly did not have to pay.

115.    Even if there were a claim within Plaintiffs' policy periods, which Plaintiffs deny, the Exclude Services Endorsement of the Policies excludes any claims against AAC in connection with providing or failing to provide professional services involving automobile sales and

repossession services.  AAC is alleged to have wrongfully repossessed Nichols' and the class's vehicles, which served as collateral for their loans.

116.    Accordingly, Plaintiffs have no duty to defend and/or indemnify AAC for any claims made by Nichols and the class members in the Underlying Lawsuit.

117.    For all the foregoing reasons, an actual controversy exists between Plaintiffs and Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

## <u>COUNT VI: DECLARATORY JUDGMENT AGAINST DEFENDANTS</u><br><u>(LATE NOTICE)</u>

118.    Plaintiffs incorporate by reference Paragraphs 1 through 117 as if fully set forth herein.

119.    The Counterclaim and the Class Counterclaim were "Claims" first made against AAC on April 14, 2016 and August 8, 2016, respectively.

120.    AAC did not satisfy the condition precedent to provide written notice to Plaintiffs "as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** is first made" because any "Claim" arising out of the Underlying Lawsuit was first made on April 14, 2016, and certainly no later than August 8, 2016, and AAC did not tender notice of such "Claim" until December 15, 2022, at a minimum, over six years (or 2,320 days) after a "Claim" was first made.

121.    Further, to the extent the Class Certification Order could be construed as a new, unrelated "Claim," which Plaintiffs deny, AAC did not tender notice of such purported new, unrelated "Claim" until seventy-six (76) days after the September 30, 2022 Class Certification Order and one hundred twenty-eight (128) days after the August 9, 2022 docket text order granting class certification, thereby failing to satisfy the condition precedent to provide written notice to Plaintiffs "as soon as practicable, but in no event later than sixty (60) days after the date such

**CLAIM** is first made."

122.    As a result of the foregoing, there is no duty to defend or indemnify AAC in the Underlying Lawsuit under any of Plaintiffs' Policies.

123.    For all the foregoing reasons, an actual controversy exists between Plaintiffs and Defendants, which vests in the Court the power to declare the rights and liabilities of the parties.

## COUNT VII: RESCISSION AGAINT AAC

124.    Plaintiffs incorporate by reference Paragraphs 1 through 123 as if fully set forth herein.

125.    Tom Wood, the president of AAC, executed the application for the 2020 Policy on or about February 25, 2019 (the "2020 Policy Application").

126.    Mr. Wood gave the following answers to the following questions on the 2020 Policy Application:

> 35.    Has any professional liability claim or suit ever been brought against the Applicant and/or any predecessor company and/or any person proposed to be insured?
> [Answer: No]
>
> 36.    Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or employees have any reasonable basis:
>
> a.    to believe that there has been a breach of a professional duty?
> [Answer: No]
>
> b.    to believe that the applicant or any predecessor in business or any of the past or present partners, Officers, Directors, or employees are aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against the applicant, any of the past or present partners, Officers, Directors or employees or former employees of the applicant?
> [Answer: No]
>        ***
> **If there is knowledge of any such fact, circumstance, or situation, any claim or action subsequently emanating**

> **therefrom shall be excluded from coverage under the proposed insurance.**

(Ex. L at UND000048).

127.    The 2020 Policy Application also included an "Auto Finance Supplement" signed by Mr. Wood in which he answered "None" in response to the following: "**The Applicant confirms by signing this application that the Applicant is not aware of any known or actual Professional Liability Losses.  If such loss(es) exist, please provide details here**."  (Ex. L at UND000050–52).

128.    At the time AAC executed the 2020 Policy Application, it knew that the Class Counterclaim in the Underlying Lawsuit was pending against it.

129.    Mr. Wood also executed the application for the 2021 Policy on or about February 21, 2020 (the "2021 Policy Application").

130.    Mr. Wood gave the following answers to the following questions on the 2021 Policy Application:

> *77. Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or employees have any reasonable basis to believe that the applicant or any predecessor in business or any of the past or present partners, Officers, Directors or employees are aware of any circumstances, incidents, or situations during the past five years which have resulted or which may result in claims being made against the applicant, any of the past or present partners, Officers, Directors or employees or former employees of the applicant? If "Yes", please explain.*
> [Answer: No]

(Ex. M at UND000100).

131.    In the 2021 Policy Application, AAC was asked to "List all losses sustained during the past five years, whether reimbursed or not, from <u>3-1-19</u> to <u>3-1-20</u>."  AAC answered as follows:

| Check if none ☑ | | | | | | |
|---|---|---|---|---|---|---|
| Date of Loss | Type of Loss | Amount of Loss | Amount Recovered from Insurance | Amount Recovered from other than Insurance | Amount of Loss Pending | If Loss occurred at other than Main Office, state location |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(Ex. M at UND000100).

132.    The 2021 Policy Application also included an "Auto Finance Supplement" signed by Mr. Wood in which he did not detail any losses in response to the following: "**The Applicant confirms by signing this application that the Applicant is not aware of any known or actual Professional Liability Losses.  If such loss(es) exist, please provide details here**."  (Ex. M at UND000101–03).

133.    At the time AAC executed the 2021 Policy Application, it knew that the Class Counterclaim in the Underlying Lawsuit was pending against it.

134.    Mr. Wood also executed the application for the 2022 Policy on or about February 19, 2021 (the "2022 Policy Application").  (Ex. N at UND000154).

135.    In the 2022 Policy Application, AAC was asked to "List all losses sustained during the past five years, whether reimbursed or not, from 3-1-20 to 3-1-21."  AAC answered as follows:

| Check if none ☒ | | | | | | |
|---|---|---|---|---|---|---|
| Date of Loss | Type of Loss | Amount of Loss | Amount Recovered from Insurance | Amount Recovered from other than Insurance | Amount of Loss Pending | If Loss occurred at other than Main Office, state location |
| | NONE Company has on record | | | | | |
| | | | | | | |
| | | | | | | |

(Ex. N at UND000154).

136.    At the time AAC answered that there were no losses on record, it knew that the Class Counterclaim in the Underlying Lawsuit was pending against it.

137.    The applications for the Policies each included admonitions to AAC in substantially the following form:

> *The undersigned authorized person, on behalf of the Applicant, attest that all claims have been reported if the Applicant is aware of them.  The Applicant further understands that any claim submitted after the completion of this application shall render any terms provided void and Underwriters shall have the right to re-underwrite the Applicant. …*

> *The undersigned authorized person, on behalf of the applicant, attests that to the best of his/her knowledge and belief the statements set forth herein are true. Although the signing of this Application Form does not bind the undersigned to effect insurance, the undersigned agrees that this application and the said statements shall be the basis of the policy of insurance and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy.*

> *The undersigned authorized person on behalf of the applicant declares that the above statements are true, that neither the undersigned person nor the applicant has suppressed or misstated facts and that at the present time the applicant has no reason to anticipate any claims being brought against the applicant or any representative of the applicant or knowledge of any negligent act, error, omission or offense on the applicant's part or any representative of the applicant except as stated herein, and agrees that this Application Form shall be the basis of the contract between the applicant and the Company and shall be deemed a part hereof.*

(Ex. L at UND000048–49; Ex. M at UND000100; Ex. N at UND000154).

138.    Accordingly, AAC knew that disclosure of any losses or claims, including the Class Counterclaim, was material to Plaintiffs' decision to issue each policy of insurance to AAC.

139.    Plaintiffs justifiably relied on AAC's representations that it did not know of any losses or claims when it issued the Policies to AAC.

140.    AAC's omission of the Class Counterclaim in the Underlying Lawsuit from its policy application for the Policies was done with reckless disregard for the truth.

141.    Accordingly, the Policies are void *ab initio* and should be rescinded.

**WHEREFORE**, Plaintiffs Those Certain Underwriters at Lloyd's, London and Markel International Insurance Company Limited respectfully pray for the following relief:

1.      A declaration that no claim was first made against AAC during the policy periods of any of the Policies, including a declaration that certification of a class does not constitute a new and/or unrelated claim;

2.      A declaration that there is no coverage under the Policies for any claims, including class claims, that are pled in the Underlying Lawsuit;

3.      A declaration that Plaintiffs have no duty to defend or indemnify AAC in the Underlying Lawsuit;

4.      An order declaring that the Policies are void *ab initio* and granting Plaintiffs the right to rescind the Policies; and

5.      Such other and further relief as the Court finds just, proper, and equitable.

Dated January 24, 2023.

Respectfully submitted,

*/s/ Meredith A. Webster*

| Jean-Paul Assouad | KS #20692 |
|---|---|
| Meredith A. Webster | KS #25103 |

Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City, MO 64108
T: (816) 960-0090
F: (816) 960-0041
jean-paul.assouad@kutakrock.com
meredith.webster@kutakrock.com

and

*/s/ Douglas Garmager*

Douglas Garmager    *Pro Hac Forthcoming*
Karbal, Cohen, Economou, Silk & Dunne, LLC
200 South Wacker Drive, Suite 2550
Chicago, IL 60606
T: (312) 431-3700
dgarmager@karballaw.com
**ATTORNEYS FOR PLAINTIFFS
CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON AND MARKEL
INTERNATIONAL INSURANCE
COMPANY LIMITED**