IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | |
|---|---|
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-1901, AND MARKEL INTERNATIONAL INSURANCE COMPANY LIMITED,<br><br>        Plaintiffs,<br>  v.<br><br>AUTOMOBILE ACCEPTANCE CORPORATION INC AND EUGENE JEROME NICHOLS,<br><br>        Defendants. | Case No. 2:23-CV-02030-DDC-ADM |

**PLAINTIFFS/COUNTER-DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL
JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP RULE 12(C)**

Plaintiffs/Counter-Defendants, Those Certain Underwriters at Lloyd's, London, subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-19012 ("Underwriters") and Markel International Insurance Company ("Markel") (collectively, "Plaintiffs"), for their Memorandum of Law in support of their Motion for Judgment on the Pleadings pursuant to FRCP Rule 12(c) on Counts I and IV of their Complaint (ECF Doc. No. 1), and on Defendant/Counter-Plaintiff Automobile Acceptance Corporation, Inc.'s ("AAC") Counterclaim for Declaratory Judgement (ECF Doc. No 18), state as follows:

**INTRODUCTION**

This action involves an insurance coverage dispute arising out of an underlying class action counterclaim against AAC that was filed on April 14, 2016, years before the "claims made" policies at issue in this action incepted. The clear and undisputed policy language at issue here

requires both that a claim be first made during the policy period and that the conduct at issue take place on or after the "Retroactive Date" of the policies, which is March 19, 2019. Here, the counterclaim that was filed in 2016 in *Automobile Acceptance Corporation v. Eugene Jerome Nichols*, which is proceeding in Clay County Circuit Court as Case No. 15CY-CV07631-01 (the "Underlying Lawsuit"), seeks damages from AAC in connection with its alleged conduct in issuing improper notices that resulted in wrongful repossession of vehicles and reporting of derogatory information to credit reporting agencies, all of which happened long before the policies were issued.

As set forth below, there are no factual matters in dispute and the only issues are questions of law, namely whether the claims-made policies Plaintiffs issued provide coverage for a lawsuit that was filed years before the policies incepted and involves conduct that took place long before the Retroactive Date of the policies. Therefore, the matter is appropriate for resolution by a motion for judgment on the pleadings, and the Court should enter an order granting judgment in favor of Plaintiffs and against Defendants.

## BACKGROUND

### I.     The Underlying Lawsuit

AAC filed a Petition for Deficiency Balance against Nichols in the Circuit Court of Jackson County, Missouri, Associate Division, Case No. 1516-CV10902, on or about May 22, 2015. (ECF Doc. No. 1-1). Following a transfer of venue to Clay County, Nichols filed an Answer and Counterclaim on or about April 14, 2016 in Case No. 15CY-CV07631[1]. (ECF Doc. No. 1-2). The Counterclaim as filed on April 14, 2016 alleged as follows:

---

[1] Case No. 15CY-CV07631 is the initial iteration of the Underlying Lawsuit. References to pleadings filed under this case number shall also be considered to be pleadings that form part of the Underlying Lawsuit.

2

>   1. Automobile Acceptance Corp. wrongfully accelerated Nichols' loan with Automobile Acceptance Corp. and wrongfully repossessed the collateral because Automobile Acceptance Corp. either failed to send the right to cure notice required by section 408.554 or sent a defective right to cure notice before repossession.
>
>   2. Automobile Acceptance Corp. violated section 408.553 by charging interest during the time after Nichols' alleged default and before Automobile Acceptance Corp. obtained a deficiency judgment.
>
>   3. Automobile Acceptance Corp. failed to send or sent Nichols a presale notice, which did not comply with the Uniform Commercial Code ("UCC") adopted by Missouri.
>
>   4. Automobile Acceptance Corp. failed to send or sent Nichols a post-sale notice, which did not comply with the UCC.
>
>   5. Nichols seeks actual damages not less than the statutory minimum provided under the UCC, and such other further relief as this Court may deem appropriate.

(ECF Doc. No. 1-2, pp. 2-3, ¶¶ 1–5). Nichols alleged that AAC attempted to wrongfully collect a deficiency balance and other charges and further alleged that AAC had wrongfully reported derogatory information to local and national consumer reporting agencies. (ECF Doc. No. 1-2, p. 7, ¶¶ 32–34).

Nichols prayed for (a) actual damages not less than the minimum damages provided by Mo. Rev. Stat. § 400.9-625(c)(2); (b) statutory damages of $500 for each defective post-sale notice that AAC sent or failed to send; (c) pre- and post-judgment interest; (d) punitive damages; (e) attorneys' fees; and (f) a declaration that the right to cure notice and pre- and post-sale notices failed to comport with statutory requirements. (ECF Doc. No. 1-2, pp. 10–11).

On June 1, 2016, AAC filed an Amended Petition for Deficiency Balance ("Amended Petition") in the Underlying Lawsuit. (ECF Doc. No. 1-3). On June 2, 2016, Nichols filed an Answer and Counterclaim to the Amended Petition and a Motion to Dismiss. (ECF Doc. No. 1-4). Following the underlying trial court's denial of the Motion to Dismiss the Amended Petition on August 5, 2016, Nichols filed a First Amended Answer and Counterclaim to the Amended

3

Petition (the "Class Counterclaim") on August 8, 2016. Nichols pled class claims in this First Amended Answer and Counterclaim. The Class Counterclaim alleged the following to describe the nature of the case:

> 1. This is a consumer class action against Automobile Acceptance Corp. ("AAC"), and its predecessors and successors, seeking relief to redress an unlawful and deceptive pattern of wrongdoing followed by AAC regarding collection, enforcement, repossession and disposition of collateral, and collection of alleged deficiencies.
> 2. AAC violated section 408.553 by charging interest during the time after Nichols' and numerous other Missouri consumers' alleged defaults and before AAC obtained deficiency judgments against them.
> 3. AAC sent Nichols and many other consumers a presale notice, which did not comply with the Uniform Commercial Code ("UCC") adopted by each state.[]  AAC's form presale notice is attached to AAC's Amended Petition with the title "Notice of Repossession and Intent to Sell or Dispose of Collateral."
> 4. AAC sent Nichols and numerous other consumers a post-sale notice, which did not comply with the UCC.  AAC's form post-sale notice is attached to AAC's Amended Petition with the title "Notice of Sale of Collateral and Deficiency (or Surplus Due)."
> 5. Nichols sues individually and for all other similarly situated consumers.  They seek actual damages not less than the statutory minimum provided for under the UCC, and for such other further relief as this Court may deem appropriate.

(ECF Doc. No. 1-5, pp. 3-4, ¶¶ 1–5). Among other things, Nichols alleged that "Nichols' claims are typical of the claims of the class members" and that "Nichols' and the classes' claims are based on the same factual and legal theories."  (*Id.* at p. 10, ¶¶ 47-48).  In this regard, Nichols alleged on behalf of himself and the proposed class that AAC had wrongfully collected or attempted to wrongfully collect a deficiency balance, interest, and other charges and further alleged that AAC had wrongfully reported derogatory information to local and national consumer reporting agencies. (*Id.* at pp. 7-8,  ¶¶ 31–34).  The Class Counterclaim pled two claims:  Count I – Class's Claim and Count II – Missouri Subclass' Claim.  (*Id.* at pp. 12–16).

On August 9, 2022, the underlying trial court granted class certification in the Underlying Lawsuit. (ECF Doc. No. 1-7). On September 30, 2022, the underlying trial court issued its Order for Class Certification in the Underlying Lawsuit (the "Class Certification Order") (ECF Doc. No. 1-8). The Class Certification Order referred to Nichols "assert[ing] counterclaims on behalf of himself and all persons similarly situated and seeking to certify the action as a class action under Rule 52.08 MRCP" in his August 8, 2016 First Amended Answer and Counterclaim. (*Id.* at pp. 2-3).

The Class Certification Order stated with respect to typicality that Nichols " 'possess[es] the same interest and suffer[ed] the same injury as the class members' " and that "Nichols' claims arise from the same event or course of conduct of AAC affecting the potential class members…" (*Id.* at p. 9). The Class Certification Order also stated that "Nichols and the class seek the same form of relief for the same alleged conduct." (*Id.* at p. 12).

On October 3, 2022, the underlying trial court entered an Amended Order for Class Certification ("Amended Class Certification Order"). (ECF Doc. No. 1-9). On December 15, 2022, AAC and Nichols filed a joint motion seeking to correct the description of the persons in the Amended Class Certification Order that were excluded from the class. AAC and Nichols stipulated to the following:

> 2. Nichols filed his class action counterclaim on August 8, 2016. Six years prior to August 8, 2016 is August 8, 2010.
>
> 3. For purposes of this proceeding in accordance with the class certification order and generating the class list as provided on page 18 of the class certification order, the parties stipulate and agree to use August 8, 2019 as the relevant cutoff date, such that persons to whom AAC sent pre-sale or post-sale notices prior to August 8, 2010, are not included within the class definition.

(ECF Doc. No. 1-10).

## II.  Notice to Plaintiffs

For the first time, AAC provided notice to Plaintiffs of the Underlying Lawsuit via e-mail to John Silk of Karbal, Cohen, Economou, Silk & Dunne, LLC, dated December 15, 2022 (the "Notice").  The Notice attached a copy of the September 30, 2022 Class Certification Order (but not the amendment); a copy of the claim information from Auto-Owners Insurance Company describing the claim as "INSD SUED CUSTOMER FOR DEFINCIARY [sic] CLMT ATTY RESUEING [sic] AS CLASS ACTION SUIT;" and the August 8, 2016 notice of loss to Auto-Owners Insurance Company, which appended a non-file-stamped copy of the Class Counterclaim.  (ECF Doc. No. 1-11).

## III.  The Policies

Plaintiffs issued three Mortgage Company Professional Liability policies to AAC as the Named Insured: (1) Certificate No. SUAWS20318-1901 for the policy period March 1, 2019 to March 1, 2020 (the "2020 Policy") (ECF Doc. No. 1-12); (2)  Certificate No. SUAWS20318-2002 for the policy period March 1, 2020 to March 1, 2021 (the "2021 Policy") (ECF Doc. No. 1-13); and (3) Certificate No. SUAWS20318-2103 for the policy period beginning March 1, 2021 to March 1, 2023, as modified by the ERP Endorsement (the "2022 Policy") (ECF Doc. No. 1-14).[2]

The Insuring Agreements of the 2020 Policy and the 2021 Policy require that a "**CLAIM**" for a "**WRONGFUL ACT**" be "first made" during the policy period, per the following:

> **I.   INSURING AGREEMENT**
>
> The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

---

[2]  The 2020 Policy, 2021 Policy, and 2022 Policy shall be collectively referred to as the "Policies."

(ECF Doc. No. 1-12, p. 9; ECF Doc. No. 1-13, p. 9). The 2022 Policy's Insuring Agreement, as modified by the ERP Endorsement, also mandates that any "**CLAIM**" for a "**WRONGFUL ACT**" be "first made" during the policy period, per the following:

> **II.   INSURING AGREEMENT**
>
> The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 and before March 01, 2022.

(ECF Doc. No. 1-14, p. 5). As quoted above, each of the Policies applies only to "**WRONGFUL ACTS**" that occur "on or after the Retroactive Date" applicable to the Policies. The Retroactive Date of the Policies is March 1, 2019. (ECF Doc. No. 1-12, p. 8; ECF Doc. No. 1-13, p. 8; ECF Doc. No. 1-14, p. 10).

The bolded terms in the above Insuring Agreements also have specific meanings. The Policies define "**CLAIM**" to mean "a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings." (ECF Doc. No. 1-12, p. 11; ECF Doc. No. 1-13, p. 11; ECF Doc. No. 1-14, p. 13). The Policies define "**POLICY PERIOD**" to mean "the period from the inception date of this Policy to the expiration date stated in Item 2 of the Declarations, or to any earlier cancellation date of this Policy." (ECF Doc. No. 1-12, p. 11; ECF Doc. No. 1-13, p. 11; ECF Doc. No. 1-14, p. 13).

The Policies define a "**WRONGFUL ACT**" as "any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations." (ECF Doc. No. 1-12, p. 10; ECF Doc. No. 1-13, p. 10; ECF Doc. No. 1-14, p. 12). The Policies define "**INTERRELATED WRONGFUL ACTS**" as

7

"**WRONGFUL ACTS** that have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." (ECF Doc. No. 1-12, p. 11; ECF Doc. No. 1-13, p. 11; ECF Doc. No. 1-14, p. 13).

The above insuring agreements and definitions set forth the basic hallmarks of what claims AAC was to report and when. When read with the additional provision that follows, they explain how later-in-time events relate back in time for purposes of determining the number and timing of any claim(s). The Policies provide under C. MULTIPLE INSUREDS, CLAIMS OR CLAIMANTS as follows:

> The inclusion herein of more than one **INSURED** or the making of **CLAIM(S)** by more than one person or organization shall not operate to increase the Company's Limit of Liability. **CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made:
>
> 1. when the earliest **CLAIM** within such single **CLAIM** was first made, or
>
> 2. when notice was first given under any policy of insurance of any **WRONGFUL ACT** or any matter, fact, circumstance, situation, event or transaction that underlies any **CLAIM** within such single **CLAIM**,
>
> and all such **CLAIM(S)** shall be subject to the same Limit of Liability.

(ECF Doc. No. 1-12, pp. 19-20; ECF Doc. No. 1-13, pp. 19-20; ECF Doc. No. 1-14, pp. 21-22).

## ARGUMENT

### STANDARD FOR JUDGMENT ON THE PLEADINGS

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings at any time after the pleadings are closed. Fed. R. Civ. P. 12(c).

Judgment on the pleadings is appropriate under Fed. R. Civ. P. 12(c) when the undisputed facts appearing in the pleadings and any facts subject to judicial notice entitle the moving party to judgment as a matter of law. *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141

(10th Cir. 2012). A partial motion for judgment on the pleadings may be granted pursuant to Rule 12(c) in the same way that partial summary judgment may be granted pursuant to Rule 56. *See VNA Plus, Inc. v. Apria Healthcare Grp., Inc*., 29 F. Supp. 2d 1253, 1258 (D. Kan. 1998) ("By analogy to the provisions of Rule 56, we find that a motion for partial judgment on the pleadings is appropriate"); *see also Sprint Nextel Corp. v. Middle Man, Inc*., 989 F. Supp. 2d 1186, 1188-89 (D. Kan. 2013), on reconsideration, (Feb. 25, 2014), *aff'd in part*, *rev'd in part*, 822 F.3d 524 (10th Cir. 2016).

Judgment on the pleadings should be granted where the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law. *Park Univ. Enters., Inc. v. Am. Cas. Co.,* 442 F.3d 1239, 1244 (10th Cir. 2006). Documents attached to the pleadings are exhibits and are to be considered in deciding a Rule 12(c) motion. *Id.* The court may also take judicial notice of matters of public record. *Id.* Thus, the court is not limited solely to the pleadings themselves but may consider documents incorporated by reference into the pleadings. *U.S. v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991); *Scottsdale Ins. v. City of Waukegan*, No. 13-cv-03088, 2014 WL 3600517, at *1 n.1 (N.D. Ill. July 21, 2014) (taking judicial notice of docket of underlying suit in declaratory action).

Under Kansas law, as the insured, AAC has the burden to prove coverage under the policy. *See Shelter Mut. Ins. Co. v. Williams*, 248 Kan. 17, 29-30, 804 P.2d 1374, 1383 (1991). The construction of a contract is a matter of law to be resolved by the court. *Hart v. Sprint Commc'ns Co., L.P.*, 872 F. Supp. 848, 854 (D. Kan.1994). In construing a written contract, the Court's job "is to ascertain and effectuate the parties' intentions whenever possible." *Payless Shoesource, Inc. v. The Travelers Companies, Inc.*, 585 F.3d 1366, 1369 (10th Cir. 2009). "The intent of the parties and the meaning of a contract are to be determined from the plain, general, and common meaning

9

of terms used." *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 241 Kan. 580, 586, 738 P.2d 866 (1987) (citations omitted). "[L]anguage used anywhere in the instrument should be construed in harmony with all provisions and not in isolation." *Id.* (citations omitted). Unless the contract is ambiguous, both the intention of the parties and the meaning of the contract must be determined exclusively from the instrument itself. *Park Univ. Enters., Inc*., 442 F.3d at 1244. "A written contract is not ambiguous unless two or more meanings can be construed from the contract provisions themselves." *Hart*, 872 F. Supp. at 854.

**I.    Plaintiffs Are Entitled to Judgment on the Pleadings Because the Underlying Class Action "Claim" Was First Made Years Before the Inception of the Policies.**

As detailed in the Complaint, Answers and Counterclaim for Declaratory Judgment, there is no dispute that each of the Policies was issued on a claims-made basis and applies only to claims "first made" against the Insured during the policy period.  As detailed in the Complaint, the exhibits to the Complaint, and the above-quoted language of the Policies, the crucial language is that the Plaintiffs' obligations only arise where "the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date."[3] Here, the undisputed and indisputable facts show that the underlying class action claim against AAC was *__filed years before the Policies incepted__*.  Courts in Kansas and the Tenth Circuit have routinely enforced the requirement in claims-made policies that a "claim" be first made during the policy period in order to trigger coverage. Therefore, based on the undisputed facts, Plaintiffs are entitled to judgment as a matter of law.

---

[3] The Plaintiffs have a host of other policy defenses.  But because it is dispositive that the claims made occurred before any of the Policies incepted and before the Policies' retroactive date, for the sake of brevity, and without waiver of all of the other coverage defenses,  Plaintiffs are moving on these issues only at this time.

10

At the outset, it is important to distinguish the claims-made nature of the Plaintiffs' Policies. Many common liability policies are written on an "occurrence" basis, which generally means that coverage arises when the injury or damage takes place, and not when a lawsuit was filed. In contrast, a claims-made policy—such as the Plaintiffs' Policies—differs from an occurrence policy because "a claims-made policy provides coverage only when a claim is made during the policy period, while an occurrence policy covers any occurrence that happens during the policy period, regardless of when the claim is made." *See Craft v. Philadelphia Indem. Ins. Co.*, 560 F. App'x 710, 711-12 (10th Cir. 2014); *see also* 13 Couch on Ins. § 186.13. The Kansas Supreme Court has further explained that:

> Under a claims-made policy, coverage is only triggered when, during the policy period, an insured discovers and notifies the insurer of either claims against the insured or occurrences that might give rise to such claims. This differs significantly from an occurrence policy, in which the coverage becomes effective if the negligent or omitted acts occur during the term of the policy. . . . In a claims-made policy, the notice is the trigger that invokes coverage.

*Am. Special Risk Mgmt. Corp. v. Cahow*, 286 Kan. 1134, 1142, 192 P.3d 614, 621 (Kan. 2008). In *Phila. Indem. Ins. Co. v. Great Plains Annual Conf. of the United Methodist Church,* No. 6:21-cv-01197-HLT-KGG, 2022 U.S. Dist. LEXIS 31076, at *9 n.5 (D. Kan. Feb. 22, 2022), the court went on to explain:

> Underscoring the fact that claims-made policies provide coverage for only a limited time period, the Kansas Supreme Court noted that such policies are generally written to exclude coverage for potential claims known to the insured before the policy's effective date. *Am. Special Risk Mgmt. Corp.*, 192 P.3d at 621. In other words, claims-made policies are generally designed to start on a clean slate and to end coverage at a specific time to limit risks to the insurer.

As noted therein, claims-made policies are expressly designed to "start on a clean slate" and, thus, simply do not apply to claims that were "first" made years before the policies incepted.

In *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803 (10th Cir. 2009), the

11

Tenth Circuit had occasion to consider claims-made language virtually identical to the Policies and concluded that "[w]e do not find any of the terms above to be ambiguous — they all have plain and ordinary meanings that can be applied to the language of the insurance policy." *Id.* at 810 (applying Colorado law). Based on such language, the Tenth Circuit held that there was no coverage for a lawsuit where the claim had been made a year prior to the policy going into effect. Here, the present dispute involves an even stronger set of facts than *Berry*, as the underlying class action "**CLAIM**" was filed several years before the Policies went into effect. Indeed, AAC put another insurance carrier, Auto Owners Insurance Company, on notice of the Class Counterclaim on August 8, 2016, *more than two and a half years before the first of the Policies incepted*. (ECF Doc. No. 1-11).

AAC seeks to avoid the Policies' claims-made requirements by contending that the granting of class certification constituted a new "**CLAIM**" under the 2022 Policy. However, even assuming, *arguendo*, that the granting of class certification as to an existing "**CLAIM**" somehow constitutes a new "**CLAIM**" under the Policies (which is disputed),[4] the language of the Policies makes clear that a "**CLAIM**" must be "first made" during the policy period. (ECF Doc. No. 1-12, p. 9; ECF Doc. No. 1-13, p. 9; ECF Doc. No. 1-14, p. 5). As pertinent to this requirement, Section V.C. of the Policies provides that "**CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made…when the earliest **CLAIM** within such single **CLAIM** was first made…". (ECF Doc. No. 1-12, p. 19; ECF Doc. No. 1-13, p. 19; ECF Doc. No. 1-14, p.

---

[4] The Policy defines a "**CLAIM**" as "a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings." AAC has failed to provide any logical explanation of how the certification of a class in a class action lawsuit that has already been filed somehow constitutes a new written demand for money damages, as distinct from the class action lawsuit from which all claims derive.

21).  The Policies define "**INTERRELATED WRONGFUL ACTS**" as "**WRONGFUL ACTS** that have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions."  (ECF Doc. No. 1-12, p. 11; ECF Doc. No. 1-13, p. 11; ECF Doc. No. 1-14, p. 13).

Here, Nichols expressly pled in the Class Counterclaim that "Nichols' claims are typical of the claims of the class members" and that "Nichols' and the classes' claims are based on the same factual and legal theories."  (ECF Doc. No. 1-5, p. 10, ¶¶ 47-48).  It is further undisputed that the Class Certification Order entered in the Underlying Lawsuit expressly found that "Nichols' claims arise from the same event or course of conduct of AAC affecting the potential class members…". (ECF Doc. No. 1-8, p. 10). As a result, Nichols' "**CLAIM**" and the purported class members' "**CLAIM(S)**" indisputably involve "**INTERRELATED WRONGFUL ACTS**."  By operation of Section V.C. of the Policies, such "**CLAIM(S)**" would be "treated as a single **CLAIM**" first made "when the earliest **CLAIM** within such single **CLAIM** was first made," which in this case would have been no later than August 8, 2016, the date when AAC received notice of the Class Counterclaim filed by Nichols.  (ECF Doc. No. 1-11). Simply put, even if this Court accepts AAC's argument that the purported class members' "**CLAIM(S)**" did not come into existence until a class was certified on September 30, 2022, there is still only a single "**CLAIM**" under the terms of the Policies and such "**CLAIM**" was first made no later than August 8, 2016 when AAC received notice of the Class Counterclaim, which was years before any of the Policies incepted.

AAC therefore cannot meet its burden of establishing coverage for the underlying class action "**CLAIM**" under the Policies because such "**CLAIM**" was not first made during the policy periods of any of the Plaintiffs' claims-made Policies.  *Shelter Mut. Ins. Co.*, 248 Kan. at 29-30,

804 P.2d at 1383.  Accordingly, based upon the clear and unambiguous language of the Policies, as found by the Tenth Circuit and the Kansas Supreme Court, this Court should grant the Plaintiffs' Motion for Judgment on the Pleadings on Count I of the Complaint and judgment in favor of Plaintiffs on AAC's Counterclaim for Declaratory Judgment.

## II.     Coverage Is Similarly Barred Because of the Retroactive Date in the Policies.

Coverage is also barred for the underlying class action claim because the alleged conduct by AAC at the heart of the class action litigation took place long before the Retroactive Date of the Policies.  As quoted above, and as set forth in detail in the Policies that are incorporated into the pleadings, the Policies only apply where a "**CLAIM**" is first made against an insured during the policy period "for a **WRONGFUL ACT** that occurred on or after the Retroactive Date."  The Retroactive Date here was March 19, 2019.  Because the class action **"CLAIM"** at issue was filed years before the Policies incepted, the relevant conduct of AAC necessarily took place years before the Retroactive Date.  Therefore, this Court should enter judgment in Plaintiffs' favor on Count IV of its Complaint and on AAC's Counterclaim for Declaratory Judgment.

In discussing claims-made policies, the Tenth Circuit has noted that under such policies, "the date of the discovery of the injury and the claim-filing date must fall within the policy period." *Nat'l Am. Ins. v. Am. Re-Ins.*, 358 F.3d 736, 738 (10th Cir. 2004). Notably the Tenth Circuit continued to explain that "[g]enerally, a claims-made policy includes a retroactive date that precludes coverage for liability-producing events occurring prior to that date." *Id.* (citing *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 409-10 (Minn. 2003)) (discussing differences between occurrence-based and claims-made policies).  Moreover, such provisions are enforceable:

> a claims made policy with limited retroactive coverage, or with a retroactive date that is the same as a policy's commencement date, is enforceable. In fact, "[i]t is

14

> commonplace for issuers of claims-made policies to limit retroactive coverage by specifying a cut-off date, such as the date of the first claims-made policy issued by the insurer to this insured, so that claims based on occurrences before that date are excluded from coverage; for protection against old occurrences, the insured must look to his occurrence policies." Retroactive dates benefit insurers because insurers limit their liability exposure "by inserting a `retroactive date' into the policy, prior to which the insured's act are not covered."

*Aspen Square, Inc. v. Am. Auto. Ins. Co.*, No. 2: 18-CV-02255-JAR-JPO, 2019 U.S. Dist. LEXIS 38364, at *19 (D. Kan. Mar. 11, 2019). That is the case here. The Policies at issue are subject to a Retroactive Date and therefore only apply to conduct alleged to have occurred after March of 2019. Thus, as noted by the Tenth Circuit, the Policies do not apply to conduct occurring before that, which encompasses the entirety of the conduct alleged in the underling class action litigation. AAC therefore cannot meet its burden of establishing coverage under the Insuring Agreement of any of the Policies. *Shelter Mut. Ins. Co.*, 248 Kan. at 29-30, 804 P.2d at 1383 (insured has the burden of proving coverage).

## CONCLUSION

As demonstrated above, there are no factual matters in dispute. The only issues are questions of law—namely whether the claims-made policies Plaintiffs issued to AAC provide coverage for a lawsuit that was filed years before the Policies incepted and for conduct that took place long before the Retroactive Date of the Policies. Based upon the clear and unambiguous language of the Policies, as determined and applied by the Tenth Circuit and the Kansas Supreme Court, this Court should grant Plaintiffs' Partial Motion for Judgment on the Pleadings on Counts I and IV of the Complaint and on AAC's Counterclaim. This matter is appropriate for resolution by a motion for judgment on the pleadings and judgment should be entered in favor of Plaintiffs and against Defendants.

**WHEREFORE**, Plaintiffs, Those Certain Underwriters at Lloyd's, London and Markel

International Insurance Company Limited, respectfully pray for the following relief:

1. A declaration that no "**CLAIM**" was first made against AAC during the policy periods of any of the Policies;

2. A declaration that the "**CLAIM**" against AAC does not involve conduct by AAC that took place on or after the Retroactive Date of the Policies;

3. A declaration that there is no coverage under the Policies for any claims, including any class claims, that are pled in the Underlying Lawsuit;

4. A declaration that Plaintiffs have no duty to defend or indemnify AAC in the Underlying Lawsuit; and

5. Such other and further relief as the Court finds just, proper, and equitable.

Dated September 7, 2023.                    Respectfully submitted,


*/s/ Meredith A. Webster*
Jean-Paul Assouad           KS #20692
Meredith A. Webster         KS #25103
Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City, MO 64108
T: (816) 960-0090
F: (816) 960-0041
jean-paul.assouad@kutakrock.com
meredith.webster@kutakrock.com

and

Douglas Garmager Admitted *Pro Hac Vice*
Karbal, Cohen, Economou, Silk & Dunne, LLC
200 South Wacker Drive, Suite 2550
Chicago, IL 60606
T: (312) 431-3700
dgarmager@karballaw.com

**ATTORNEYS FOR PLAINTIFFS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND MARKEL INTERNATIONAL INSURANCE COMPANY LIMITED**

**CERTIFICATE OF SERVICE**

   The undersigned hereby certifies that on September 7, 2023, a true and correct copy of the above and foregoing ***Plaintiffs' Memorandum of Law in Support of Motion for Partial Judgment on the Pleadings*** was filed with the Clerk of the Court for the District Court of Kansas by using the CM/ECF system, which will send notice of electronic filing to the following counsel of record:

Jesse B. Rochman
Martin L. Daesch
OnderLaw, LLC
110 E. Lockwood Ave.
St. Louis, MO 63119
rochman@onderlaw.com
daesch@onderlaw.com
**Attorney for Defendant Nichols**

Blake H. Butner
Hillary Hyde
James C. Morrow
Morrow Willnauer Church, LLC
8330 Ward Parkway, Suite 300
Kansas City, MO 64112
bbutner@mwcattorneys.com
hhyde@mwcattorneys.com
jmorrow@mwcattorneys.com
**Attorneys for Defendant Automobile Acceptance Corporation, Inc.**

               */s/ Meredith A. Webster*