UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-1901; and MARKEL INTERNATIONAL INSURANCE COMPANY LIMITED, | |
| Plaintiffs/Counterclaim Defendants, | Case No. 23-2030-DDC-ADM |
| v. | |
| AUTOMOBILE ACCEPTANCE CORPORATION, INC. and EUGENE JEROME NICHOLS, | |
| Defendants/Counterclaim Plaintiffs. | |

## PRETRIAL ORDER

On November 17 and December 18, 2023, U.S. Magistrate Judge Mitchell conducted a pretrial conference in this case, by phone. Plaintiffs/Counterclaim Defendants Those Certain Underwriters at Lloyd's, London, subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-1901; and Markel International Insurance Company Limited (collectively, "Underwriters") appeared through counsel Meredith Webster and Douglas Garmager. Defendant/Counterclaim Plaintiff Automobile Acceptance Corporation, Inc. ("AAC") appeared through counsel Blake Butner. Defendant/Counterclaim Plaintiff Eugene Jerome Nichols ("Nichols") (collectively, "Defendants") appeared through counsel Jesse Rochman.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.    **PRELIMINARY MATTERS.**

    a.    **Subject-Matter Jurisdiction.**   Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332 and 28 U.S.C. § 2201 and is not disputed.

    b.    **Personal Jurisdiction.**   The court's personal jurisdiction over the parties is not disputed.

    c.    **Venue.**   Venue in this court is not disputed.

    d.    **Governing Law.**   Subject to the court's determination of the law that applies to the case, the parties believe and agree that Kansas law governs the substantive issues in this case.

2.    **STIPULATIONS.**

    a.    The following facts are stipulated:

**<u>The Underlying Lawsuit</u>**

    i.    This is an insurance coverage dispute that arises out of an underlying class-action counterclaim that Nichols filed against AAC in the lawsuit styled *Automobile Acceptance Corporation v. Eugene Jerome Nichols*, which is currently proceeding in Clay County Circuit Court as Case No. 15CY-CV07631-01 (the "Underlying Lawsuit").

    ii.    On May 22, 2015, AAC filed a Petition for Deficiency Balance against Nichols in the Circuit Court of Jackson County, Missouri, Associate Division, Case No. 1516-CV10902.  The case was transferred to Clay County and re-assigned Case No. 15CY-CV07631.  As of September 16, 2016, the effective case number is Case No. 15CY-CV07631-01.

    iii.    On April 14, 2016, Nichols filed an Answer and Counterclaim in which he asserted that AAC had wrongfully collected or attempted to wrongfully collect a deficiency balance and other charges, and that AAC had wrongfully reported derogatory information to local and national consumer reporting agencies.  Nichols prayed for various relief, including statutory damages, punitive damages, and declaratory relief.

    iv.    On June 1, 2016, AAC filed an Amended Petition for Deficiency Balance ("Amended Petition").  On June 2, 2016, Nichols filed an Answer and Counterclaim to the Amended Petition.

v.      On August 8, 2016, Nichols filed a First Amended Answer and Counterclaim to the Amended Petition (the "Class Counterclaim") asserting claims against AAC on behalf of a putative class of similarly situated consumers to whom AAC had allegedly sent pre- and post-sale notices of the disposition of collateral and assessed deficiency/surplus balances that did not comply with the Uniform Commercial Code ("UCC"). Nichols' Class Counterclaim asserted two counts:

- Count I on behalf of a national class sought actual damages not less than the minimum provided under UCC § 9-625(c)(2), statutory damages of $500 for each defective post-sale notice that AAC sent or failed to send, pre- and post-judgment interest, injunctive relief, and declaratory relief.

- Count II on behalf of a Missouri subclass sought actual damages not less than the minimum provided under R.S. Mo. § 400.9-625(c)(2), statutory damages of $500 for each defective post-sale notice that AAC sent or failed to send, pre- and post-judgment interest, attorneys' fees, punitive damages, injunctive relief, and declaratory relief.

- The actual damages Nichols sought for Counts I and II included loss of use of tangible property and cost of alternative transportation; loss resulting from the inability to obtain, or increased costs of, alternative financing; harm to credit worthiness, credit standing, credit capacity, character, and general reputation; harm caused by defamation, slander and libel; and harm caused by invasion of privacy. Count I also sought surplus proceeds from the sale of collateral, return of time-price differential, and delinquency and collection charges on consumer credit contracts.

vi.     On August 8, 2016, AAC provided notice of the Class Counterclaim to its insurer, Auto-Owners Insurance Company ("Auto-Owners"). On September 16, 2016, AAC filed an answer to the Class Counterclaim.

vii.    On March 26, 2021, Nichols filed a motion for class certification.

viii.   On September 30, 2022, the court entered an order certifying a class comprising "all persons who AAC mailed a pre-sale notice or post-sale notices" (the "Class Certification Order"), finding that: (1) Nichols had "assert[ed] counterclaims on behalf of himself and all persons similarly situated and [was] seeking to certify the action as a class action under Rule 52.08 MRCP"; (2) Nichols "'possess[es] the same interest and suffer[ed] the same injury as the class members'"; (3) "Nichols' claims arise from the same event or course of conduct of AAC affecting the potential class members"; and (4) "Nichols and the class seek the same form of relief for the same alleged conduct."

3

ix.     On October 3, 2022, the court amended the class definition to include "all persons to whom AAC mailed … pre-sale notices or post-sale notices" (the "Amended Class Certification Order").

x.      On October 17, 2022, AAC and Nichols filed a Joint Motion Regarding Class Certification Without Waiver seeking to correct the description of the persons excluded from the class definition in the Amended Class Certification Order and stipulating that: (1) "Nichols filed his class action counterclaim on August 8, 2016"; and (2) the parties "agree to use August 8, 2010 as the relevant cutoff date, such that persons to whom AAC sent pre-sale or post sale notices prior to August 8, 2010, are not included within the class definition."

xi.     On December 15, 2022, the court in the Underlying Lawsuit ordered, pursuant to stipulation, that: (1) "Nichols filed his class action counterclaim on August 8, 2016"; and (2) the parties "agree to use August 8, 2010 as the relevant cutoff date, such that persons to whom AAC sent pre-sale or post sale notices prior to August 8, 2010, are not included within the class definition."

### The Policies

xii.    Underwriters issued Mortgage Company Professional Liability policies to AAC bearing Certificate No. SUAWS20318-1901 for the policy period March 1, 2019 through March 1, 2020 ("2020 Policy"); bearing Certificate No. SUAWS20318-2002 for the policy period March 1, 2020 through March 1, 2021 ("2021 Policy"); and bearing Certificate No. SUAWS20318-2103 for the policy period March 1, 2021 through March 1, 2023 ("2022 Policy") (collectively, "the Policies").

xiii.   The Insuring Agreement of the Policies states: "The Company will pay on behalf of the INSURED LOSS in excess of the Retention stated in Item 4 of the Declarations which the INSURED shall become legally obligated to pay as a result of any CLAIM first made against the INSURED during the POLICY PERIOD for a WRONGFUL ACT that occurred on or after the Retroactive Date stated in Item 6 of the Declarations."  That Retroactive Date is March 1, 2019.

xiv.    The application for the 2020 Policy, dated February 25, 2019, and signed by AAC President Tom Wood ("Wood"), had "No" checked for these questions:

35. Has any professional liability claim or suit ever been brought against the Applicant and/or any predecessor company and/or any person proposed to be insured?

4

36. Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or employees have any reasonable basis:

> a. to believe there has been a breach of professional duty?
> b. to believe that the applicant or any predecessor in business or any of the past or present partners, Officers, Directors or employees are aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against the applicant, any of the past or present partners, Officers, Directors or employees or former employees of the applicant?

xv.    On an "Auto Finance Supplement" for the 2020 Policy, also signed by Wood as AAC's President, "None" was typed in response to the following: "The Applicant confirms by signing this application that the Applicant is not aware of any known or actual Professional Liability Losses.  If such loss(es) exist, please provide details here."

xvi.   The application for the 2021 Policy, dated February 21, 2020, and signed by Wood, had "No" checked for this question:

77. Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or employees have any reasonable basis to believe that the applicant or any predecessor in business or any of the post or present partners, Officers, Directors or employees are aware of any circumstances, incidents, or situations during the past five years which have resulted or which may result in claims being made against the applicant, any of the past or present partners, Officers, Directors or employees or former employees of the applicant?

xvii.  The application for the 2021 Policy asked for a list of all losses sustained during the past five years, whether reimbursed or not, from "3-1-19 to 3-1-20," which was immediately followed by a box that said, "Check if none." That box was checked.

xviii. On an "Auto Finance Supplement" for the 2021 Policy, also signed by Wood as AAC's President on February 21, 2020, there was no response to the following: "The Applicant confirms by signing this application that the Applicant is not aware of any known or actual Professional Liability Losses. If such loss(es) exist, please provide details here."

xix.   The application for the 2022 Policy, dated February 19, 2021, and signed by Wood as "Owner," had "No" checked for this question:

77. Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or employees have any reasonable basis to believe that the applicant or any predecessor in business or any of

5

the past or present partners, Officers, Directors or employees are aware of any circumstances, incidents, or situations during the past five years which have resulted or which may result in claims being made against the applicant, any of the past or present partners, Officers, Directors or employees or former employees of the applicant?

xx.    The application for the 2022 Policy asked for a list of all losses sustained during the past five years, whether reimbursed or not, from "3-1-20 to 3-1-21," which was immediately followed by box that said, "Check if none." That box was checked.

xxi.    On an "Auto Finance Supplement" for the 2023 Policy, also signed by Wood as "Owner" on February 19, 2021, there was no response to the following: "The Applicant confirms by signing this application that the Applicant is not aware of any known or actual Professional Liability Losses. If such loss(es) exist, please provide details here."

### AAC's Notice of Claim

xxii.    On December 15, 2022, AAC gave Underwriters notice of Nichols' claim against AAC.  AAC provided Underwriters' designated agent for notice with: (1) a copy of the Class Certification Order; (2) a copy of claim information from Auto-Owners describing the claim as "INSD SUED CUSTOMER FOR DEFINCIARY [sic] CLMT ATTY RESUEING [sic] AS CLASS ACTION SUIT"; and (3) the August 8, 2016 notice of loss to Auto-Owners, which appended a non-file-stamped copy of the Class Counterclaim.

### Underwriters' Denial of Coverage

xxiii.    On January 9, 2023, Underwriters denied coverage for the Class Counterclaim for the reasons set forth in their letter of that date, a copy of which is attached hereto as Exhibit A.

xxiv.    That letter contains excerpts of many of the policy exclusions discussed below.

b.    The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

i.    May 22, 2015 Petition for Deficiency Balance filed by AAC against Nichols in Case No. 1516-CV10902.

ii.    April 14, 2016 Answer and Counterclaim filed by Nichols in Case No. 15CY-CV07631.

iii.　　June 1, 2016 Amended Petition for Deficiency Balance filed by AAC in Case No. 15CY-CV07631.

iv.　　June 2, 2016 Answer and Counterclaim filed by Nichols in Case No. 15CY-CV07631.

v.　　August 8, 2016 First Amended Answer and Counterclaim filed by Nichols in Case No. 15CY-CV07631.

vi.　　September 16, 2016 Answer filed by AAC in Case No. 15CY-CV07631.

vii.　　Court Docket in Case No. 15CY-CV07631.

viii.　　September 30, 2022 order for class certification in Case No. 15CY-CV07631.

ix.　　October 3, 2022 Amended Order for Class Certification in Case No. 15CY-CV07631.

x.　　November 17, 2022 Order in Case No. 15CY-CV07631 (Doc. 38-2).

xi.　　December, 12, 2022 Certificate of Service in Case No. 15CY-CV07631 (Doc. 38-3).

xii.　　December 15, 2022 Joint Motion Regarding Class Certification Without Waiver filed in Case No. 15CY-CV07631.

xiii.　　Notice and attachments provided by AAC to Underwriters on December 15, 2022.

xiv.　　Mortgage Company Professional Liability policy Certificate No. SUAWS20318-1901 issued to AAC for the policy period March 1, 2019 to March 1, 2020, inclusive of the Policy application.

xv.　　Mortgage Company Professional Liability policy Certificate No. SUAWS20318-2002 issued to AAC for the policy period March 1, 2020 to March 1, 2021, inclusive of the Policy application.

xvi.　　Mortgage Company Professional Liability policy Certificate No. SUAWS20318-2103 issued to AAC for the policy period March 1, 2021 to March 1, 2023, inclusive of the Policy application.

xvii.　　January 9, 2023 coverage letter from Douglas R. Garmager, Esq. to Timothy Monsees, Esq.

xviii.　　December 30, 2022 letter from Timothy Monsees, Esq. to John K. Silk, Esq.

xix.　　December 23, 2022 letter from John K. Silk Esq. to Amy Haning.

xx.     The settlement agreement for the Class Counterclaim in Case No. 15CY-CV07631-01.[1]

xxi.    Any final judgment in Case No. 15CY-CV07631-01.[2]

**3.     FACTUAL CONTENTIONS.**

    **a.     Plaintiff Underwriters' Factual Contentions.**

The Policies provide "claims-made" coverage pursuant to which the Policies' Insuring Agreement is triggered only by a "**CLAIM**"[3] for a "**WRONGFUL ACT**" first made during the "Policy Period."  Nichols first made a single "**CLAIM**" against AAC on April 14, 2016, when he filed his Answer and Counterclaim in the Underlying Lawsuit.  At the very latest, Nichols first made a single "**CLAIM**" against AAC by August 8, 2016, when Nichols filed the Class Counterclaim in the Underlying Lawsuit.  AAC recognized that a claim had been made against it on August 8, 2016 because it reported the claim to another insurer, Auto-Owners.  Neither of these dates—April 14 or August 8, 2016—is during any "**POLICY PERIOD**" in which the Policies were in effect or on or after the March 1, 2019 Retroactive Date after which any "**WRONGFUL ACT**" must occur.  Indeed, AAC and Nichols stipulated that August 8, 2010 is the cut-off date for any class claims.

The Class Certification Order and the Amended Class Certification Order that were entered by the court in the Underlying Lawsuit in the fall of 2022 are not a new "**CLAIM**" distinguishable from the August 2016 counterclaims.  No new "**CLAIM**" was made against AAC based on class certification alone because the class claims involve "**INTERRELATED WRONGFUL ACTS**" in that the acts or omissions pled in the Class Counterclaim and that afflict the class members

---

[1] At this time, any settlement agreement in the Underlying Lawsuit is not yet final, and Underwriters did not have a copy of the fully executed settlement agreement.

[2] There is not yet any final judgment in the Underlying Lawsuit.

[3] Terms in quotation marks and bolded are defined terms in Underwriters' Policies.

involve a common nexus of facts, circumstances, situations, transactions, or events, or a series of facts, circumstances, situations, transactions, or events, in which AAC allegedly repossessed vehicles, attempted to collect against debtors for deficiency balances based on allegedly defective pre- and post-sale notices, and reported derogatory information to credit agencies as a result. AAC recognized that a class action counterclaim—a "**CLAIM**"—was being made against it as of August 8, 2016. A pleaded class action counterclaim before certification is also notice of a set of circumstances that could result in a certified class action—because it did. Yet AAC did not disclose the Class Counterclaim in its policy applications or notify Underwriters until December 15, 2022, which was more than three months after the court entered the Class Certification Order.

The "**CLAIM**" made against AAC on April 14, 2016—or at the latest on August 8, 2016— is also not a "**CLAIM**" for a "**WRONGFUL ACT**" for purposes of triggering the Policies' Insuring Agreement. A "**CLAIM**" for a "**WRONGFUL ACT**" cannot involve (1) conduct that does not fall within the Policies' insured professional services of automobile loan origination or automobile loan servicing; (2) allegations that AAC's conduct was "wanton, outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass"; and (3) allegations that AAC engaged in slander, libel, and defamation, which are non-negligent, intentionally harmful acts. The Class Counterclaim pleads theories of liability that arise from defective pre- and post-sale notices in connection with the repossession and sale of automobiles, rather than loan servicing. The Class Counterclaim also pleads theories of liability arising from reporting allegedly derogatory information to credit agencies. These theories of liability include theories based on intentional and willful conduct.

Further, the "**CLAIM**" against AAC asserts theories of recovery seeking statutory damages, injunctive relief, declaratory relief, and punitive damages that do not constitute a "**LOSS,**" as defined by the Policies, and therefore do not fall within the Policies' Insuring Agreement.

As set forth above, AAC's President Wood also did not disclose the April 14, 2016 claim or the Class Counterclaim in the Policies' annual applications.  Wood made several attestations on behalf of AAC, including that AAC had reported all claims, that the statements set forth in the application were true, that AAC agreed the statements in the application formed the basis of the policy and were incorporated therein, that no facts had been misstated, that AAC had no reason to anticipate any claims being brought against it, and that neither AAC nor Wood had knowledge of any negligent act, error, omission, or offense on AAC's part.  Wood's representations in the applications were material to the risk, and Underwriters agreed to issue the Policies in reliance on representations that have proven to be untrue.  Accordingly, the Policies should be rescinded.

If, however, the Policies are not rescinded and there was a "**CLAIM**" first made against AAC during one or more of the Policies, multiple exclusions and/or conditions would still apply to preclude any duty to defend or indemnify under the Policies.

There is no duty to defend or indemnify because of  Section IV.O. of the Policies in that: (1) AAC gave notice of the claims of the class and of Nichols to Auto-Owners on August 8, 2016, before the Policies' inception; (2) the claims of the class and of Nichols involve "**INTERRELATED WRONGFUL ACTS**" and therefore represent one single "**CLAIM**" first made when AAC received the Class Counterclaim on August 8, 2016; and (3) AAC knew before the Policies' Coverage Date of March 1, 2019 (as set forth in Item 7 of the Declarations) of a "[m]atter, fact, circumstance, situation, event or transaction" that would cause a reasonable person

to believe that a "**CLAIM**" for a "**WRONGFUL ACT**" may be made: namely, a putative class action lawsuit that had been pending against it since 2016.

There is no duty to defend or indemnify because of Section VI.A. of the Policies in that AAC did not give Underwriters timely notice of a "**CLAIM**" "as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** [was] first made." Any "**CLAIM**" against AAC was first made no later than August 8, 2016, and AAC did not tender notice of such "**CLAIM**" until more than six years later on December 15, 2022. Even if the Class Certification Order could be a new "**CLAIM**," AAC still waited more than sixty days to provide notice to Underwriters of the Class Certification Order.

Underwriters have no duty to defend or indemnify under the Policies' Exclude Services Endorsement because the claims of the class and of Nichols involve allegations that AAC wrongfully repossessed the vehicles of Nichols and the class and thus involves AAC's performance of "automobile sales and repossession services," which are expressly excluded under the Policies.

There is no duty to defend or indemnify under Exclusion BB of the Policies because AAC is alleged to have: wrongfully accelerated the loans of Nichols and of the class members after allegedly failing to send compliant pre-sale notices; wrongfully repossessed and sold the vehicles that served as collateral; sent non-compliant post-sale notices; and wrongfully attempted to collect on deficiency balances, fees, and interest that Nichols and the class allegedly did not have to pay. The Underlying Lawsuit thus pleads theory of recovery based on the actual or alleged misrepresentation or misstatement of the terms of any loan and/or the assessment of improper, excessive, illegal or unauthorized fees, penalties, or costs, which conduct is excluded under Exclusion BB.

There is no duty to defend or indemnify, in whole or in part, based on the following exclusions: (1) Exclusion G based on the Underlying Lawsuit's allegations of harm caused by defamation, slander, libel, and/or invasion of privacy, including, but not limited to, harm to credit worthiness, credit standing, credit capacity, character, and general reputation, arising from alleged wrongful derogatory reports made to local and national credit reporting agencies; (2) Exclusion C to the extent the Underlying Lawsuit alleges damages arising from the loss of use of tangible property; (3) Exclusion J to the extent Nichols and/or the class seek injunctive and declaratory relief; (4) Exclusion A to the extent it is determined that AAC gained any personal profit or advantage to which it was not legally entitled; (5) Exclusion B to the extent of any judgment or final adjudication that AAC's acts were "wanton, outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass"; and (6) Exclusion M to the extent AAC becomes legally obligated to pay "**LOSS**" because of any actual or alleged unfair competition because of its alleged "unlawful and deceptive" business practices.

**b.    AAC's/Nichols's Factual Contentions.**

**i.    *Each class member's "claims" were "first made" during the policy period.***

The fact that the Underlying Lawsuit was filed before the Policies' inception is irrelevant to determining whether Underwriters have a duty to defend.  Class actions involve the joinder of the class members' separate claims against AAC, hundreds of which came into existence after the Policies' inception.  The 2022 Policy had a policy period beginning March 1, 2021, and ending March 1, 2023. The Underlying Lawsuit is a class action against AAC regarding thousands of consumers' separate secured transactions under UCC Article 9.  Each class member's "claims" were "first made" during the "Policy Period."  On December 12, 2022, AAC produced a class list identifying at least 2,121 separate secured transactions within the class definition. The outermost

date of the class list involved a secured transaction where the presale notice was mailed on October 26, 2022.   At least 468 separate secured transactions involved presale notices sent after the Retroactive Date of March 1, 2019.   The earliest the class members' "separate claims" against AAC became a part of the Underlying Lawsuit—and were "first made"—was when the court certified the Underlying Lawsuit on September 30, 2022.   Even then, the class definition was not finalized until October 17, 2022 (when the parties stipulated to the class period), and AAC did not know who met the class definition and/or when their claims accrued until the class list was completed on December 12, 2022.   Whether the class members' "separate claims" were "first made" on September 30, October 17, or December 12, 2022—all of these dates were during the 2022 Policy.

Common sense also dictates the date of the Underlying Lawsuit (August 8, 2016) is irrelevant.   The outermost date of the class list involved a secured transaction where the presale notice was mailed on October 26, 2022.   It would have been impossible for this separate claim to be "first made" on August 8, 2016, because no claim existed on that secured transaction until October 26, 2022.   The same is true for hundreds of claims on the class list that did not come into existence until the Policies' inception.

AAC's notice of the claims to Underwriters on December 15, 2022, was timely because AAC gave notice less than 60 days after the class members' claims were joined in the Underlying Lawsuit.   Even if AAC gave notice after 60 days, nothing happened in the litigation that prejudiced Underwriters.[4]

---

[4] Underwriters objected to any express or implied attempt to assert prejudice as a defense because (1) it was not pled as a defense, and (2) there is no recognized prejudice defense to late notice under claims-made policies.   But AAC explained that the issue of prejudice is not asserted as a stand-alone defense, but instead bears on AAC's equitable defenses.

### ii.    The class members' claims were "separate claims."

Underwriters contend that the claims of Nichols and the class members involve "Interrelated Wrongful Acts" that would be treated as being "first made" on August 8, 2016. The Policies define "Interrelated Wrongful Acts" as "any actual or alleged negligent act[s], negligent error[s] or negligent omission[s]" that "have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." Here, there is no "common nexus" sufficient to trigger the definition of "Interrelated Wrongful Acts." While the claims of Nichols and the class members were typical of each other and shared similarities sufficient for class certification, the wrongful acts alleged by each class member involved separate secured transactions. There is no "causal link" between them because no class member's claim depends on any other class member's claim. The facts, circumstances, situations, events, and transactions of each class member are different and distinct:

1. The vehicles purchased by each class member differed.

2. The separate secured transactions of each class member were entered into at different times and places, with different loan terms, and were secured by different collateral.

3. The repossession and sale of each class member's vehicles took place at different times and places under different circumstances.

4. Each class member was sent presale and post-sale notices at different times and places, with content unique to his or her separate secured transaction.

5. The forms used for Nichols's presale and post-sale notices differed from those sent to class members.

6. The facts, circumstances, situations, events, and transactions related to each class member's loss or actual damages also necessarily differed.

AAC used different templates to generate the presale and post-sale notices sent to class members on the class list:

*Presale Notices*

1. August 8, 2010 to July 2016 - AAC used the same template it used to generate the presale notice sent to Nichols.

2. July 2016 to December 2019 – AAC began using a different template than the one it used to generate presale notices sent to Nichols.

3. December 2019 to the present – AAC began using different presale notice forms depending on whether the consumer resided in Missouri or Kansas.

*Post-Sale Notices*

1. August 8, 2010 to December 2019 – AAC used the same template it used to generate the post-sale notice sent to Nichols.

2. December 2019 to the present – AAC began using a different template than the one it used to generate the post-sale notices sent to Nichols.

Construed narrowly, or naturally, the Underlying Lawsuit does not involve "Interrelated Wrongful Acts" such that the separate claims of each class member were "first made" on August 8, 2016.

### iii.    *The Retroactive Date does not bar coverage.*

The Retroactive Date in the Policies is March 1, 2019.  Underwriters contend that because "the class action '**CLAIM**' at issue was filed years before the Policies' inception, AAC's relevant conduct necessarily took place years before the Retroactive Date."  This is objectively wrong.  The class definition in the counterclaim was open-ended, and so was the class definition certified by the state court.

### iv.    *The claims of Nichols and the class members involve "LOSS."*

The Policies define "LOSS" to mean "money damages." The claims of Nichols and the class members involve "LOSS" as defined by the Policies because they seek actual damages not less than the minimum provided under UCC § 9-625(c)(2).

### v.    *Underwriters are not entitled to rescission.*

Underwriters contend the Policies should be rescinded based on the Policies' annual applications. The questions on the applications were vague and ambiguous and AAC's answers to

those questions, even if erroneous, were not inconsistent with good faith. Even if AAC's answers to the Policies' annual applications were untrue, which is denied, the answers were not known to be untrue by the party making them, not made with the intent to deceive or recklessly made with disregard for the truth, and did not contribute to the contingency or event on which the Policies are due and payable. This is all especially true given class certification was granted after the applications were submitted. Assuming Underwriters had a right to rescission, which is disputed, they did not act immediately—or even with reasonable promptness—after discovery of the alleged grounds for rescission and restore AAC with its insurance premiums.

### vi.  *No exclusion applies.*

The Policies insure negligent acts, errors, or omissions in the performance or failure to perform "automobile loan origination" and "automobile loan servicing." AAC's alleged acts, errors, or omissions arose out of automobile loan origination or automobile loan servicing and were negligent because AAC did not intend to violate Missouri law. Nichols's allegations do not relate to "automobile sales" or "repossession services." None of the exclusions raised by Underwriters excludes coverage, especially when strictly and narrowly construed as required by Kansas law.

- **Exclusion A**

Exclusion A does not apply because there is no "LOSS" in connection with any "CLAIM" in the Underlying Lawsuit based on AAC gaining any personal profit or advantage to which it was not legally entitled.

- **Exclusion B**

Exclusion B does not exclude coverage of "LOSS" in connection with any "CLAIM" in the Underlying Lawsuit unrelated to criminal, dishonest, intentionally malicious, or fraudulent

acts, errors, or omissions. This exclusion does not apply because AAC did not intend to violate any of the statutes under the UCC.

- **Exclusions C, G, and J**

Exclusions C, G, and J do not exclude coverage of the Underlying Lawsuit's allegations of harm unrelated to loss of use of tangible property, defamation, slander, libel, invasion of privacy, injunctive relief, and declaratory relief. The Underlying Lawsuit seeks actual damages not less than the minimum provided under UCC § 9-625(c)(2), which includes harm beyond those specified in Exclusions C, G, and J, including without limitation, cost of alternative transportation, loss resulting from the inability to obtain, or increased costs of, alternative financing, and other uncertain and hard-to-quantify actual damages.

- **Exclusion M**

Exclusion M does not exclude coverage of "LOSS" in connection with any "CLAIM" in the Underlying Lawsuit unrelated to unfair competition, interference with contract, or violation of anti-trust laws. This exclusion does not apply because the Underlying Lawsuit does not allege unfair competition, interference with contract, or violation of anti-trust laws.

- **Exclusion N**

Exclusion N does not exclude coverage of "LOSS" in connection with any "CLAIM" in the Underlying Lawsuit there was no coverage under any other existing policies, including the policy with Auto-Owners, for "LOSS" in connection with AAC's conduct occurring after the Retroactive Date. Auto-Owners also denied there was coverage.

- **Exclusion O**

Exclusion O does not exclude coverage of "LOSS" in connection with any "CLAIM" in the Underlying Lawsuit for the reasons discussed in Paragraphs 3(b)(i)–(iii).

- **Exclusion BB**

Exclusion BB excludes coverage based on misrepresentation or misstatement of the terms of any loan or the assessment of improper, excessive, illegal, or unauthorized fees, penalties, or costs. The Underlying Lawsuit involves claims against AAC on behalf of a putative class of similarly situated consumers to whom AAC had allegedly sent pre- and post-sale notices of the disposition of collateral and assessed deficiency/surplus balances that did not comply with the Uniform Commercial Code ("UCC"). These claims neither involve the misrepresentation or misstatement of the terms of any loan nor fees, penalties, or costs being assessed by AAC, so Exclusion BB does not exclude coverage.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Underwriters' Claims.

Underwriters assert that they are entitled to relief against AAC and Nichols based on the following theory(ies):

      **i.**   <u>Declaratory Judgment</u> –Underwriters seek a declaratory judgment that they have no duty to defend or indemnify AAC in the Underlying Lawsuit for the following reasons:

- <u>No Claim During Policy Period</u> (Count I) – Nichols first made a "**CLAIM**" against AAC on April 14 and no later than August 8, 2016. This was prior to the Policies' inception, so no claim was made during any of the policy periods to trigger the Policies' Insuring Agreements.

- <u>No "Loss"</u> (Count II) – Statutory damages, injunctive relief, declaratory relief, and punitive damages do not constitute a "**LOSS**" under the Policies.

- <u>No "Wrongful Act"</u> (Count III) – The conduct alleged in the Underlying Lawsuit does not involve a "**WRONGFUL ACT**" (as defined by the Policies) because: (a) the claims against AAC are not in connection with automobile loan origination or loan servicing; (b) AAC's conduct was alleged to be "wanton, outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass;" and (c) the Underlying

Lawsuit alleges that AAC engaged in slander, libel, and defamation, which are non-negligent, intentionally harmful acts.

- <u>Retroactive Date</u> (Count IV) – The claims asserted in the Underlying Lawsuit involve conduct that occurred prior to the Policies' Retroactive Date of March 1, 2019.

- <u>Exclusions</u> (Count V) – The following exclusions in the Policies exclude claims against AAC in the Underlying Lawsuit:

    o Exclusion N excludes coverage because AAC had another valid policy with Auto-Owners that provided coverage to AAC for some or all of the claims in the Underlying Lawsuit.

    o Exclusion O excludes any claims for which AAC may be held liable because: (1) the claims of Nichols and the class involve a "Wrongful Act" (as defined by the Policies) or a matter, fact, circumstance, situation, event or transaction that has been the subject of a claim made prior to the Policies' inception; (2) AAC first reported the Class Counterclaim to Auto-Owners in 2016, which was long before the first of the Policies' inception; and (3) AAC knew prior to the Policies' Coverage Date of March 1, 2019, of a matter, fact or circumstance that would cause a reasonable person to believe that a "Claim" for a "Wrongful Act" might be made—namely, a putative class action lawsuit that had been pending against AAC since 2016.

    o Exclusion G excludes coverage to the extent the allegations in the Underlying Lawsuit claim harm caused by defamation, slander, libel, and/or invasion of privacy—including but not limited to harm to credit worthiness, credit standing, credit capacity, character, and general reputation—arising from alleged wrongful derogatory reports made to local and national credit reporting agencies.

    o Exclusion C excludes coverage to the extent the alleged damages in the Underlying Lawsuit arise from loss of use of tangible property.

    o Exclusion J excludes coverage to the extent the plaintiffs in the Underlying Lawsuit pray for injunctive and declaratory relief.

    o Exclusion A excludes coverage to the extent it is determined that AAC gained any personal profit or advantage to which it was not legally entitled.

    o Exclusion B excludes coverage to the extent any judgment and resulting damages are based on acts that were "wanton,

outrageous, and/or malicious because of [AAC's] reckless indifference to or conscious disregard of the consumer rights of Nichols and the Missouri Subclass."

o Exclusion M excludes coverage to the extent that AAC is determined to have engaged in unfair competition because of its alleged "unlawful and deceptive" business practices.

o Exclusion BB excludes coverage to the extent that AAC misrepresented or misstated the terms of any loan and/or assessed improper, excessive, illegal, or unauthorized fees, penalties, or costs when AAC allegedly wrongfully accelerated the loans of Nichols and class members after allegedly failing to send compliant pre-sale notices; thereafter allegedly wrongfully repossessed and sold the vehicles that served as collateral; allegedly sent non-compliant post-sale notices; and allegedly wrongfully attempted to collect on deficiency balances, fees, and interest that Nichols and the class allegedly did not have to pay.

o The Exclude Services Endorsement excludes any claims against AAC in connection with providing or failing to provide professional services involving automobile sales and repossession services, and AAC is alleged to have wrongfully repossessed the vehicles of Nichols and class members that served as collateral for their loans.

• Late Notice (Count VI) – AAC did not satisfy the condition precedent of providing written notice of a "**CLAIM**" to Underwriters "as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** is first made." Here, any "Claim" arising out of the Underlying Lawsuit was first made on April 14, 2016, and certainly no later than August 8, 2016, and AAC did not first tender notice of such "Claim" until December 15, 2022 (at a minimum, over six years (or 2,320 days) after a "**CLAIM**" was first made).

ii. Rescission (Count VII) – Underwriters are entitled to rescind the Policies based on material misrepresentations in the policy applications in which AAC attested that it was not aware of any claims, losses, and/or circumstances, incidents, or situations that could result in a claim.

**b.   AAC's Defenses.**

AAC asserts the following defenses to Underwriters' claims:

i. Underwriters have a duty to defend because there is a "nonfrivolous possibility" that the claims against AAC "may fall within the coverage" of the Policies. The Policies insure negligent acts, errors, or omissions in the

performance or failure to perform "automobile loan origination" and "automobile loan servicing." AAC's alleged acts, errors, or omissions arose out of automobile loan origination or automobile loan servicing and were negligent in that AAC did not intend to violate Missouri law.

ii.   To the extent the Policies are ambiguous, they must be interpreted in favor of the insured to provide coverage. For example, the Policies define "Interrelated Wrongful Acts" using the phrase "common nexus," which has been found ambiguous. Moreover, the Policies "Interrelated Wrongful Acts" provision's placement (under the heading "**LIMIT OF LIABILITY**") evinces the narrower scope of the provision such that a reasonably prudent insured would understand that it addresses only the *amount* of coverage available (i.e., the "Limit of Liability") and not the *availability* of coverage discussed under the headings of "Insuring Agreement" and "Exclusions." Because this construction is reasonable, if there are any other reasonable constructions, this provision is ambiguous.

iii.   To the extent that the Policies appear to exclude coverage for the claim(s) in the Underlying Lawsuit, any such exclusions are void, unenforceable, and/or illusory because the exclusions read, individually and collectively, render coverage functionally nonexistent, create a situation where AAC cannot foresee any circumstances under which it would collect under the Policies, or essentially denies AAC most if not all of a promised benefit.

iv.   Underwriters' failure to accept the tender of defense and indemnity and filing of this declaratory judgment action constitute acts of bad faith in contravention to the Policies' implied duty of good faith.[5]

v.   Underwriters' claim for rescission is barred based upon the doctrine of laches because they did not act immediately—or even with reasonable promptness—after discovering the alleged grounds for rescission and restore AAC with its insurance premiums.

---

[5] Underwriters objected to including breach of the duty of good faith and fair dealing as an affirmative defense on the grounds that Kansas does not permit such a theory to be pled as an affirmative defense. The court overruled this objection because AAC plead this as an affirmative defense, so it is fairly in the case although Underwriters of course are free to litigate the viability of this defense on the merits. The court further notes that AAC did not plead this theory as an affirmative claim for relief and therefore it is reserved only as a defense.

**c.      Nichols's Defenses**

Nichols asserts the same defenses to Underwriters claims as AAC, except for the

defense asserted in Paragraph 4(b)(iv) above, which Nichols did not plead. [6]

**d.      AAC's Counterclaim.**

AAC asserts that it is entitled to relief from Underwriters based on the following theory:

      **i.**      <u>Declaratory Judgment</u> (Count 1) -- Underwriters breached the Policies by denying they had an obligation to pay for AAC's defense, by failing to provide AAC's defense against the claims asserted in the Underlying Lawsuit, and by denying they had an obligation to indemnify AAC for any judgment that may be rendered against AAC in the Underlying Lawsuit.

**e.      The Underwriters' Defenses to AAC's Counterclaim**

      **i.**      Underwriters incorporate their claims set forth in Section 4(a) of this Pretrial Order as defenses to AAC's Counterclaim.

      **ii.**      Underwriters have no duty to indemnify AAC for payments AAC voluntarily made or obligations AAC voluntarily incurred without Underwriters' prior approval and consent in breach of Section II of the Policies, including any defense costs or settlement monies paid or incurred.

      **iii.**      Underwriters' coverage obligations (if any) are limited by the Policies' liability limits of $1,000,000 per claim and $2,000,000 in the aggregate.

      **iv.**      Underwriters' coverage obligations (if any) are only in excess of the Policies' self-insured retention of $10,000 each Claim.

      **v.**      Underwriters' coverage obligations (if any) are excess to any other insurance available to AAC.  Underwriters are therefore entitled to a setoff as to any amounts paid by Auto Owners or any other insurer(s) who have paid defense or indemnity to AAC in connection with the Underlying Lawsuit.

      **vi.**      AAC is estopped from claiming coverage under the Policies because it did not admit in its applications for the Policies that there was a claim pending against it before the first of the Policies was issued and Plaintiffs issued each of the Policies at a premium based on the absence of any claims, which was material to the risk underwritten and was to their detriment.

---

[6] Underwriters object to Nichols' assertion of the affirmative defense of laches because such was not pled by Nichols either.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiffs seek a declaratory judgment finding no duty to defend and/or indemnify in connection with each of Counts I-VI of the Complaint.  Plaintiffs also seek rescission of the Policies in Count VII and are prepared to return the premium paid for each of the Policies should each be rescinded on the basis of material misrepresentation.

AAC and Nichols seek a declaratory judgment finding Underwriters have a duty to defend and indemnify AAC for the Underlying Lawsuit.

**6.      AMENDMENTS TO PLEADINGS.**

None.

**7.      DISCOVERY.**

Discovery is complete.

**8.      MOTIONS.**

**a.      Pending Motions.**

Plaintiffs' Motion for Partial Judgment on the Pleadings Pursuant to FRCP Rule 12(c). (ECF 36.)

**b.      Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

- Motions for Summary Judgment

- Motions in Limine

The dispositive-motion deadline is re-set for **February 2, 2024**.  The parties must follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

      **c.**     **Motions Regarding Expert Testimony.**  The parties have stipulated that no expert testimony will be used in this case, so no motions regarding expert testimony will be filed.

**9.**     **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **October 1, 2024, at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 2 days.  The parties anticipate the case may be largely resolved on cross-motions for summary judgment.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions *in limine*, and proposed findings of fact and conclusions of law in bench trials.

**10.**     **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties are at an impasse on settlement negotiations.  The court finds that mediation after the court has decided summary-judgment motions could be helpful.  The court therefore orders the parties to mediate by **August 30, 2024**.[7]  By **July 1, 2024**, the parties must file a joint

---

[7] The parties disagree on whether any mediation should be conducted live or over Zoom.  The court leaves this decision to the selected mediator.

notice stating the full name, mailing address, and telephone number of the mediator they selected, along with the firmly scheduled date, time, and place of mediation,

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated January 5, 2024, at Kansas City, Kansas.


s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge