IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy Nos. SUA WS20318-2103, SUA WS20318-2002, and SUA WS20318-1901, et al.,**<br><br>    Plaintiffs,<br><br>v.<br><br>**AUTOMOBILE ACCEPTANCE CORPORATION, INC., et al.,**<br><br>    Defendants. | Case No. 23-2030-DDC |

## MEMORANDUM AND ORDER

This case is an insurance coverage dispute. At bottom, the parties disagree whether plaintiffs must defend and indemnify claims arising in a class action lawsuit against their insured. The story begins with the emergence of that underlying class action.

In May 2015, defendant Automobile Acceptance Corporation—AAC for short—sued defendant Eugene Nichols in Missouri state court, seeking to collect a deficiency balance from Nichols. In August 2016, defendant Nichols counterclaimed on behalf of a putative class, alleging defendant AAC had repossessed and sold consumers' collateral without mailing them proper presale and post-sale notices, thus violating the Uniform Commercial Code. The same month, defendant AAC notified an insurer, Auto-Owners Insurance Company, of defendant Nichols's class counterclaim. The Missouri state court certified the class in September 2022.

Plaintiffs—Those Certain Underwriters at Lloyd's, London and Markel International Insurance Company Limited—issued defendant AAC three Mortgage Company Liability Policies, with the first starting coverage in March 2019 and the last ending coverage in March

2023. AAC didn't mention Nichols's class action counterclaim to plaintiffs when it applied for the policies. In fact, AAC didn't notify plaintiffs about the class action until December 2022, when the Missouri state court certified the class. Plaintiffs denied coverage, arguing, among other things, that the policy only covers claims first made during the policy period of 2019 to 2023, and the class action counterclaim was first made against AAC in 2016. Plaintiffs then filed this action against AAC and Nichols, seeking a declaratory judgment that plaintiffs have no duty to defend or indemnify AAC for Nichols's counterclaim in the underlying lawsuit. Defendant AAC has counterclaimed, seeking a declaratory judgment that plaintiffs breached the policies.

Defendants' joint position is that the policies cover the class action because each class member brings a separate claim, and the class first made those claims when the Missouri court certified a class in 2022. The court disagrees and concludes that a class action claim is first made when it's filed, not when a court certifies the class. Alternatively, defendants argue that the class members' claims—though similar enough for class certification—aren't similar enough to qualify as interrelated wrongful acts under the policies. The court rejects this argument as well, concluding that it tries to let defendants have their cake and eat it, too.

Plaintiffs have filed a Motion for Partial Judgment on the Pleadings (Doc. 36) and a Motion for Summary Judgment (Doc. 48). This Order only decides plaintiffs' Motion for Summary Judgment. And the court grants that motion because Nichols's class counterclaim was first made when Nichols filed it in 2016, before the insurance policies began. The court explains this decision, below.

### I. Background

In May 2015, defendant AAC filed a Petition for Deficiency Balance against defendant Nichols in Missouri state court. Doc. 45 at 2 (Pretrial Order ¶ 2.a.ii.). The case wound up in

Clay County Circuit Court. *Id.* Defendant Nichols filed an answer and a counterclaim on April 14, 2016. *Id.* (Pretrial Order ¶ 2.a.iii.). Nichols alleged that AAC wrongfully had collected or attempted wrongfully to collect a deficiency balance and other charges. *Id.* Nichols also alleged that AAC wrongfully had reported derogatory information to consumer reporting agencies. *Id.* In August 2016, Nichols amended his answer and counterclaim to assert claims against AAC on behalf of a putative class. *Id.* at 3 (Pretrial Order ¶ 2.a.v.).

### *The Class Counterclaim*

Nichols sought to represent a class of similarly situated consumers to whom AAC allegedly had sent pre- and post-sale notices of disposition of collateral and assessed deficiency/surplus balances that did not comply with the Uniform Commercial Code. *Id.* The court refers to this action as the "Class Counterclaim." The Class Counterclaim asserted two claims. *Id.* Count I—brought on behalf of a nationwide class—sought damages under the UCC, statutory damages for each defective post-sale notice, interest, injunctive relief, and declaratory relief. *Id.* Count II—brought on behalf of a Missouri subclass—sought damages under Missouri law, and, just like Count I, statutory damages for each defective post-sale notice, interest, injunctive relief, and declaratory relief. *Id.* AAC notified an insurer, Auto-Owners Insurance Company, of the Class Counterclaim in August 2016. *Id.* (Pretrial Order ¶ 2.a.vi.). AAC answered the Class Counterclaim in September 2016. *Id.*

Nichols moved to certify the class in March 2021. *Id.* (Pretrial Order ¶ 2.a.vii.). The Missouri court certified the class on September 30, 2022. *Id.* (Pretrial Order ¶ 2.a.viii.). The Missouri court's Class Certification Order certified a class of "all persons who AAC mailed a pre-sale notice or post-sale notices[.]" *Id.* And the Class Certification Order found Nichols: (i) asserted the Class Counterclaim on behalf of himself and others similarly situated, (ii) possessed the same interest and suffered the same injury as other class members, (iii) brought claims

arising from the same event or same AAC course of conduct affecting the potential class, and (iv) sought the same form of relief for the same alleged conduct as the class. *Id.* The Missouri court later amended its class definition to include "all persons to whom AAC mailed . . . pre-sale notices or post-sale notices." *Id.* at 4 (Pretrial Order ¶ 2.a.ix.).

The parties then defined the relevant cut-off dates for the class. In October 2022, the parties stipulated that Nichols had filed the Class Counterclaim on August 8, 2016. *Id.* (Pretrial Order ¶ 2.a.x.). And the parties agreed to use August 8, 2010, as the cutoff date for the class. *Id.* So, anyone to whom AAC sent notices before that date is excluded from the class. *Id.* The Missouri court accepted these stipulations in December 2022. *Id.* (Pretrial Order ¶ 2.a.xi.).

### *The Policies*

Plaintiffs issued three Mortgage Company Professional Liability policies to AAC. They are:

1. The 2020 Policy (Policy No. SUAWS20318-1901) covering March 1, 2019, through March 1, 2020. *Id.* (Pretrial Order ¶ 2.a.xii.).

2. The 2021 Policy (Policy No. SUAWS20318-2002) covering March 1, 2020, through March 1, 2021. *Id.*

3. The 2022 Policy (Policy No. SUAWS20318-2103) covering March 1, 2021, through March 1, 2023. *Id.*

The policies' insuring agreement states that plaintiffs will pay the "**INSURED LOSS**" for "which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date" provided in the policy. *Id.* (Pretrial Order ¶ 2.a.xiii.). This "Retroactive Date" is March 1, 2019. *Id.*

When applying for the 2020 Policy, AAC President Tom Wood answered several questions on an application dated February 25, 2019. *Id.* at 4–5 (Pretrial Order ¶ 2.a.xiv.). The

4

application asked whether any professional liability claim or suit ever had been brought against AAC.[1]  *Id.*  Mr. Wood responded, "No."  *Id.*  The application also asked whether AAC had any reasonable basis to believe that AAC had breached a professional duty.  *Id.*  Mr. Wood responded, "No."  *Id.*  The application also asked whether AAC had any reasonable basis to believe that AAC, its predecessors, partners, officers, directors, or employees, were "aware of any circumstances, incidents, or situations during the past five years which may result in claims being made against" AAC.  *Id.*  Mr. Wood again responded, "No."  *Id.*  On an "Auto Finance Statement" for the 2020 Policy, Mr. Wood confirmed that AAC wasn't aware of any known or actual Professional Liability Losses and Mr. Wood signed the statement.  *Id.*  Mr. Wood gave similar answers when applying for the 2021 Policy and the 2022 Policy.  *Id.* at 5–6 (Pretrial Order ¶¶ 2.a.xvi.–xxi.).

### *AAC's Notice of Claim & Plaintiffs' Denial*

AAC notified plaintiffs of Nichols's claim on December 15, 2022.  *Id.* at 6 (Pretrial Order ¶ 2.a.xxii.).  With this notice, AAC gave plaintiffs: (i) a copy of the class certification order; (ii) a copy of claim information from the other insurer, Auto-Owners Insurance Company; and (iii) the August 8, 2016, notice of loss AAC had sent to Auto-Owners Insurance Company, which appended a non-file-stamped copy of the Class Counterclaim.  *Id.*

Plaintiffs responded by denying coverage on January 9, 2023.  *Id.* (Pretrial Order ¶ 2.a.xxiii.).  Plaintiffs now have moved for summary judgment on their declaratory judgment count and defendant AAC's counterclaim for declaratory judgment.  Doc. 48.  Plaintiffs assert that they're entitled to judgment as a matter of law because, among other things, no claim first

---

[1]   The court has simplified the fussy insurance language used to ask these questions for the sake of clarity.

was made against AAC during the policy periods. The court begins its analysis of plaintiffs' motion by reciting the governing legal standard.

## II. Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81

F.3d 988, 990 (10th Cir. 1996)); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it's an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

**III.     Analysis**

Plaintiffs' Motion for Summary Judgment seeks two things relevant to this Order: (1) a declaration that there is no coverage under the policies for any claims in Nichols's underlying lawsuit and (2) a declaration that plaintiffs have no duty to defend or indemnify AAC in the underlying lawsuit.² Doc. 48 at 2–3. Plaintiffs provide several different ways to get to the declarations they seek—various policy interpretations, exclusions, etc. But the court need only consider one argument: whether Nichols's underlying lawsuit is a claim first made against AAC during the relevant policy periods.

---

² This relief sought by the current motion differs slightly from the declaratory relief plaintiffs request in the Pretrial Order. In the Pretrial Order, plaintiffs "seek a declaratory judgment that they have no duty to defend or indemnify AAC in the Underlying Lawsuit[.]" Doc. 45 at 18 (Pretrial Order ¶ 4.a.i.). The Motion for Summary Judgment, however, also asks for a declaration of no coverage. Given the court's ultimate conclusion in this Memorandum and Order that Nichols's claim was first made in 2016 and therefore falls outside the policies' Insuring Agreement, this distinction likely makes little difference. But, to the extent that plaintiffs' Motion for Summary Judgment makes a claim not presented by the Pretrial Order, the court considers that claim waived. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (explaining that "the pretrial order is the controlling document for trial[,]" and, "[a]s such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived" (citation and internal quotation marks omitted)).`

The court begins its analysis of this argument by reciting some legal concepts about insurance contracts.  The court then addresses plaintiffs' argument that the policies' insuring agreement doesn't cover the underlying lawsuit.  The court follows with an analysis of defendants' counterargument, *i.e.*, that the class members first made their claims when the class was certified in 2022.  Next, the court considers plaintiffs' argument that, even if the class members brought separate claims, the policies consider the class members' claims as a single claim under the policies' § V.C.  Ultimately, the court determines that plaintiffs are entitled to judgment as a matter of law on their declaratory judgment request.  It then considers the proper remedy and closes with a statement of the court's conclusions.

The court opens this discussion by identifying some basics on contract interpretation. Plaintiffs' summary judgment motion requires the court to interpret an insurance contract.  "The construction and effect of contracts 'is a question of law to be determined by the court.'" *Hart v. Sprint Commc'ns Co.*, 872 F. Supp. 848, 854 (D. Kan. 1994) (quoting *First Hays Banshares, Inc. v. Kan. Bankers Sur. Co.*, 769 P.2d 1184, 1191 (Kan. 1989)).  The parties agree that Kansas substantive law controls this dispute.[3]  Doc. 45 at 2 (Pretrial Order ¶ 1.d.).

Under Kansas law, an "insurance policy is a contract; plain and unambiguous language contained within the contract must be given its plain meaning." *Shelter Mut. Ins. Co. v. Williams ex rel. Williams*, 804 P.2d 1374, 1379 (Kan. 1991).  "Where an insurance contract is open to different constructions," then the contract is ambiguous, and the court must adopt the

---

[3]  Absent a choice of law provision, Kansas conflict of laws rules apply the *lex loci contractus* doctrine, that is, "the law of the state where the contract is made governs." *In re K.M.H.*, 169 P.3d 1025, 1031–32 (Kan. 2007).  "A contract is made where the last act necessary for its formation occurs." *Id.*  "In cases involving insurance policies, [Kansas] courts have repeatedly held the contract is made where the policy is delivered." *Layne Christensen Co. v. Zurich Can.*, 38 P.3d 757, 767 (Kan. Ct. App. 2002). Defendant AAC was a Kansas corporation with its principal place of business in Kansas.  Doc. 1 at 3 (Compl. ¶ 5).  The court thus assumes that the parties premise their agreement on the rational assumption that plaintiffs delivered defendant AAC's policy to AAC in Kansas.

8

construction "most favorable to the insured[.]" *Id.* But "an ambiguity must not be created where none exists." *Id.* Plaintiffs, as the insurer, bear the burden "to establish facts which bring the case within the exceptions contained in the policy." *Id.* at 1383 (quotation cleaned up). Defendants, as the insured, bear "the burden to show the loss falls within a coverage provision[.]" *Id.* (quotation cleaned up).

Here, plaintiffs emphasize that the policies at issue are so-called "claims-made" policies. "A claims-made policy differs from an occurrence policy in that a claims-made policy provides coverage only when a claim is made during the policy period, while an occurrence policy covers any occurrence that happens during the policy period, regardless of when the claim is made." *Phila. Indem. Ins. Co. v. Great Plains Ann. Conf. of the United Methodist Church*, No. 21-cv-1197-HLT-KGG, 2022 WL 522962, at *3 (D. Kan. Feb. 22, 2022) (applying Kansas law). As the Kansas Supreme Court has explained,

> Under a claims-made policy, coverage is only triggered when, during the policy period, an insured discovers and notifies the insurer of either claims against the insured or occurrences that might give rise to such claims. This differs significantly from an occurrence policy, in which the coverage becomes effective if the negligent or omitted acts occur *during* the term of the policy. . . . In a claims-made policy, the notice is the trigger that invokes coverage.

*Am. Special Risk Mgmt. Corp. v. Cahow*, 192 P.3d 614, 621 (Kan. 2008).

The Kansas Supreme Court has emphasized the important role that notice plays to interpreting a claims-made policy correctly. Notice triggers coverage. "Clear notice of a claim or occurrence during the policy period is crucial because allowing actual notice beyond the policy period would constitute an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." *Id.* (quotation cleaned up). With a claims-made policy, an insurer can "close its books on a policy at the expiration date and thus attain a level of predictability unattainable

9

under standard occurrence policies." *Id.* (quotation cleaned up).  To achieve these goals, "claims-made policies are generally written to eliminate coverage for claims arising out of negligent acts or omissions known to the insured prior to policy inception, notwithstanding that the claim is made during the policy period." *Id.* (quotation cleaned up).

Plaintiffs argue that the claims-made policies at issue here don't provide coverage for a lawsuit filed years before the policies took effect.  Here's what plaintiffs call the "crucial policy language:"

> **I.   INSURING AGREEMENT**
>
> The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

Doc. 1-12 at 9 (2020 Policy); *see also* Doc. 1-13 at 9 (2021 Policy) (same); Doc. 1-14 at 5 (2022 Policy) (same, but with "that occurred on or after the Retroactive Date stated in Item 6 and before March 01, 2022" added).[4]  And the policies define claim as "a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings."  Doc. 1-12 at 11 (2020 Policy); Doc. 1-13 at 11 (2021 Policy); Doc. 1-14 at 13 (2022 Policy).  Plaintiffs argue they're entitled to judgment as a matter of law because, according to the undisputed facts, defendant Nichols first made his class action claim against defendant AAC in 2016—years before the policies at issue activated.

---

[4]   The parties have stipulated to the admissibility of these three policies.  Doc. 45 at 7 (Pretrial Order ¶¶ 2.a.xiv.–xvi.).

Defendants respond, arguing that plaintiffs miss a crucial point: That is, defendant Nichols brought a *class action* counterclaim. According to defendants, when Nichols filed the Class Counterclaim "is irrelevant . . . because class actions involve the joinder of class members' 'separate claims' against AAC." Doc. 51 at 11 (emphasis omitted) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)). To defendants, *class certification* is the event that makes all the difference. They contend that a class action is a mere procedural mechanism that allows a court to hear multiple "claims at once." *Id.* So, until the Missouri state court certified the class, any nonnamed class member wasn't a party to the action. And so, defendants' logic reasons, they couldn't make a claim in the case. Under this approach, the class members' separate claims against AAC were first made when the Missouri state court certified the class on September 30, 2022. The court rejects defendants' proposition.

The policies' insuring agreement promises to pay "any **CLAIM** first made against the **INSURED** during the policy period for a **WRONGFUL ACT** that occurred on or after the Retroactive Date[.]" Doc. 1-12 at 9 (2020 Policy). And the policies define claim as "a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings." *Id.* at 11 (2020 Policy). A certified class doesn't come with a new demand for money damages. And defendant Nichols first made the Class Counterclaim in 2016. Defendants can cherry-pick quotes from caselaw all they want—*i.e.*, a "'class action . . . merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits,'" Doc. 51 at 11 (quoting *Shady Grove*, 559 U.S. at 408) or "'unnamed putative class members are certainly not parties before the class is certified,'" Doc. 38 at 7 (quoting *Frank v. Crawley Petrol. Corp.*, 992 F.3d 987, 999 (10th Cir. 2021)). But this caselaw doesn't negate (or even dilute) the importance of the policies' definition of claim:

11

"a written demand for money damages received by an **INSURED**[.]."  Doc. 1-12 at 11 (2020 Policy).

The court must enforce "plain and unambiguous language contained within the contract" and give that language "its plain meaning."  *Shelter Mut. Ins. Co.*, 804 P.2d at 1379.  Defendant Nichols made the demand for money damages on behalf of a putative class in 2016.  Defendants never assert that the 2022 certification came with a new *written* demand for money damages.  That's just not how class actions work.  So, defendant Nichols first made the Class Counterclaim against defendant AAC in 2016—a time outside the policy period—and plaintiffs are entitled to judgment as a matter of law on their declaratory judgment request.

To avoid this outcome, defendants invoke what they term as "common sense."  Doc. 38 at 8.  They point out that the class definition includes plaintiffs with claims based on presale notices mailed in October 2022.  Defendants assert it "would've been impossible for this separate claim to be 'first made' on August 8, 2016 . . . because no claim existed on that secured transaction until October" 2022.  *Id.*  But defendants' common sense fights the central premise in the parties' contracts:  the class members' claims are not separate claims *as the policy defines claims*.  There's only one written demand for money damages in this case's factual story, and it's the one defendant Nichols filed in 2016.

Even if defendants were right that each class member brings a different claim and some of these claims fall within the policy period, defendants face another barrier:  § V.C. of the policies.  Section V. governs "Limit of Liability and Retention."  *See* Doc. 1-12 at 19 (2020 Policy).  This provision provides:

> **C.   MULTIPLE INSUREDS, CLAIMS OR CLAIMANTS**
>
> The inclusion herein of more than one **INSURED** or the making of **CLAIM(S)** by more than one person or organization shall not operate to increase the Company's Limit of Liability. **CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made:
>
> 1. when the earliest **CLAIM** within such single **CLAIM** was first made, or
>
> 2. when notice was first given under any policy of insurance of any **WRONGFUL ACT** or any matter, fact, circumstance, situation, event or transaction that underlies any **CLAIM** within such single **CLAIM**,
>
> and all such **CLAIM(S)** shall be subject to the same Limit of Liability.

*Id.* at 19–20. So, the policies—which function as the complete statement of the parties' agreement with one another—treat claims arising out of "interrelated wrongful acts" as a single claim. The policies define "**INTERRELATED WRONGFUL ACTS**" as "**WRONGFUL ACTS** that have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." *Id.* at 11. Plaintiffs contend that the Class Counterclaim qualifies as a single claim under § V.C. They're right.

As an initial matter, the court has no trouble discerning the meaning of these provisions and holds that the definition of interrelated wrongful acts is unambiguous. *See Axis Surplus Ins. Co. v. Johnson*, No. 06-CV-500-GKF-PJC, 2008 WL 4525409, at *8 (N.D. Okla. Oct. 3, 2008) (holding similar language—defining interrelated wrongful acts as "any and all Wrongful Act that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of

13

causally or logically connected facts, circumstances, situations, events, transactions or causes"—clear and unambiguous). As a result, the court must give these words their plain meaning.

The parties' dispute turns on the words "common nexus." Defendants maintain that the class members' claims are too different to share a common nexus—*i.e.*, different transactions, different notices at different times, different vehicles, with different times and places of repossession. A leading legal dictionary defines "nexus" as a "connection or link, often a causal one[.]" *Nexus*, Black's Law Dictionary (12th ed. 2024). Do the class members' claims in the Class Counterclaim share a common connection or link, particularly a causal one? Of course they do—or they wouldn't be proper for a certified class to assert them in one bundle. Indeed, the class certification order determined:

- defendant Nichols possessed the same interest and suffered the same injury as other class members;

- defendant Nichols' claims arose from the same event or course of conduct by AAC affecting the other class members; and

- defendant Nichols and the class sought the same form of relief for the same alleged conduct by AAC.

Doc. 45 at 3 (Pretrial Order ¶ 2.a.viii.). The court rejects defendants' attempt to have their cake and eat it too. On one hand, plaintiffs argued to one court that their claims are similar enough for class certification, and then, on the other hand, they urge this court to conclude that their claims are too dissimilar to share a common nexus. The court thus concludes that even if the class members had asserted separate claims—and to be clear, they didn't—those claims arise out of interrelated wrongful acts because they all share a common nexus. And so, under the policies, those purportedly separate claims still would qualify as a single claim anyway.

One might read this discussion and, reasonably, think that some other court must have encountered this issue before. It has. And it was our Circuit. In *American Southwest Mortgage*

14

*Corp. v. Continental Casualty Co.*, 84 F.4th 910 (10th Cir. 2023), an auditor's audit failed to discover that a company was committing fraud. *Id.* at 911. Some lenders who made loans to the deceitful company then sued the auditor for negligence. *Id.* The auditor's insurer, Continental Casualty, defended the lawsuit. *Id.* The lawsuit required the court to determine whether the auditor's yearly audits—in 2014, 2015, 2016—were "interrelated claims" under Continental Casualty's policy with the auditor. *Id.* at 912. The district court concluded that "the claims arising from each different audit were separate, not interrelated[.]" *Id.* The Circuit, albeit applying Oklahoma law, reversed.

      The *American Southwest* policy defined "interrelated claims" as "all claims arising out of a single act or omission or arising out of interrelated acts or omissions in the rendering of professional services." *Id.* (internal quotation marks omitted). And the policy defined interrelated acts or omissions as "all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *Id.* (internal quotation marks omitted). Our Circuit seized this policy's "logically connected" language, and it held each audit report was "logically related because the same common facts and circumstances tie the [auditor's] recurring negligent acts together." *Id.* at 914–15. Also, the Circuit explained, the auditor performed the same service for the same client each year and made the same error, which perpetuated the same fraud scheme. *Id.* at 915. This pattern showed that each audit was logically connected. *Id.* And each "audit report flowed from the other as a result of one common circumstance: the Auditor's negligence." *Id.* (quotation cleaned up).

      Here, the Missouri state court's class certification order commands the same outcome on the controlling policy language. That court determined that the class members' claims arise from

the same course of conduct—defendant AAC's course of conduct.  Defendants try to chip away from this conclusion, arguing that *American Southwest Mortgage* included "different and broader" policy language than the policies at issue here: "common nexus" here versus "logically and causally connected" there.  Doc. 51 at 15.  According to defendants, "common nexus" means only "causally connected." *Id.* at 16.  But the definition of "nexus" suggests nexus *often* means a causal connection, not that it *exclusively* requires a causal connection.  *Nexus*, Black's Law Dictionary (12th ed. 2024).  The policies' term "common nexus" isn't as limited as defendants think.  And, in any event, the class certification order concluded that defendant "Nichols' claims arise from the same event or course of conduct of AAC affecting the potential class members[.]" Doc. 45 at 3 (Pretrial Order ¶ 1.a.viii.) (internal quotation marks omitted).  So, as in *American Southwest Mortgage*, the court concludes that the class members' claims are interrelated.

Defendants argue that this case more closely resembles *Stauth v. National Union Fire Insurance Company of Pittsburgh*, 185 F.3d 875, 1999 WL 420401 (10th Cir. 1999) rather than *American Southwest Mortgage*.  Doc. 51 at 16.  In *Stauth*, a customer sued a company called Fleming in 1993 over pricing issues.  *Stauth*, 199 WL 420401 at *2.  The case eventually settled after a verdict against Fleming, and Fleming's insurer paid a substantial portion of the claim.  *Id.*  In 1996, Fleming stockholders and noteholders filed ten different class actions against Fleming and various directors and officers.  *Id.* at *3.  Highly summarized, the class action plaintiffs alleged that Fleming had failed to disclose the 1993 lawsuit in its SEC filings, so Fleming notes were artificially inflated.  *Id.*  Fleming notified its insurers of the 1996 lawsuits, and the insurer responded that it considered the 1996 lawsuit covered by Fleming's 1993 policy, not its 1996 policy.  *Id.* at *4.  The 1993 policy stated that "all Loss arising out of all interrelated Wrongful Acts . . . shall be deemed one Loss[.]" *Id.*  And the policy defined interrelated wrongful acts as

16

"*causally connected* errors, statements, acts, omissions, neglects or breaches of duty or other such matters[.]" *Id.* (emphasis in original).

*Stauth* boiled down to one question: whether the 1996 securities lawsuits were "causally connected" to the 1993 pricing lawsuit. The insurer claimed the two were causally connected, but our Circuit determined that there were too many fact issues about the two lawsuits to resolve the issue at summary judgment. *Id.* at *6–7. The Circuit emphasized that it couldn't compare the 1996 lawsuits with the 1993 lawsuit because the insurer hadn't adduced enough evidence about the settlement of the 1993 lawsuit. *Id.* at *6. The insurer also claimed that two other Fleming customers brought pricing actions like the 1993 lawsuit, but failed to adduce evidence about those lawsuits, too. *Id.* at *7. Nor did the insurer explain the scale or proportion of the 1993 lawsuit. *Id.* And the 1996 lawsuits included both a shareholder lawsuit and a noteholder lawsuit, further complicating the comparison. *Id.*

Here, the parties don't dispute the relevant facts. To decide this issue on summary judgment, the court requires no more than the stipulated facts in the Pretrial Order and the language of the policies. And the court's task here is much simpler than the court's task in *Stauth* because it's comparing class members' claims to those asserted by other class members, rather than comparing two distinct lawsuits to one another—one lawsuit which has settled and the other lawsuit which contains two different kinds of securities actions. And another court already has held those class members' claims arise from the same event or course of conduct. In sum, this case doesn't resemble *Stauth*.

In sum, even if the class members have separate claims, the policies require the court to treat those claims as a single claim. Under the policies, that single claim was first made: (1) when the earliest claim was first made, or (2) when notice was first given under any policy of

17

insurance. Defendant Nichols first made his Class Counterclaim in 2016, so the claim was first made in 2016—outside the period insured by plaintiffs' policy.

Defendants have one last heave in them, asserting § V.C. doesn't help plaintiffs because of § V.C.'s location within the policies. Recall that § V is titled "Limit of Liability and Retention." Doc. 1-12 at 19 (2020 Policy). In defendants' view, this heading "clearly evinces the narrower scope of this provision." Doc. 51 at 12 (citation and internal quotation marks omitted). That is, the heading signals the insured that it limits the amount of coverage available, but it doesn't affect the availability of coverage. *Id.*

But § V.C. doesn't eliminate coverage at all. Instead, as pertinent here, it does two things: (i) it collapses a bunch of interrelated claims into a single claim and (ii) it defines when that single claim was first made. So, its placement under "Limit of Liability and Retention" makes sense because it limits potential liability for many claims by compressing them into liability for one claim if the claims are sufficiently related. The Insuring Agreement—not § V.C.—eliminates coverage. The Insuring Agreement is the provision that promises to pay "any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date[.]" Doc. 1-12 at 9 (2020 Policy). So, even if the class members' claims qualify as separate claims, the limit of liability in § V.C. collapses those claims into one claim, first made when the earlier claim is filed. Here, that limit just so happens to push the relevant claim outside the policy period in the Insuring Agreement. Plaintiffs thus deserve judgment as a matter of law because the policies don't cover defendants Nichols's underlying lawsuit. The court thus grants plaintiffs' Motion for Summary Judgment. With that decided, the court, next, considers the remedy sought by plaintiffs' motion.

### IV.   Remedy

Plaintiffs seek two things in the Pretrial Order.

*One*, they seek "a declaratory judgment that they have no duty to defend or indemnify AAC in the Underlying Lawsuit." Doc. 45 at 18 (Pretrial Order ¶ 4.a.i.). In this vein, plaintiffs' Motion for Summary Judgment asks for a "declaration that there is no coverage under the Policies for any claims in the Underlying Lawsuit, including the Class Counterclaim[.]" Doc. 49 at 35. Plaintiffs also ask for a "declaration that Plaintiffs have no duty to defend or indemnify AAC in the Underlying Lawsuit[.]" *Id.* In both the Pretrial Order and their Motion for Summary Judgment, plaintiffs give the court several different roads to follow to reach that result. In this Memorandum and Order, the court needs but one of them: defendant Nichols first made his claim against defendant AAC before the policies incepted, so AAC's claim for the Underlying Lawsuit isn't covered and plaintiffs have no duty to defend or indemnify AAC. Plaintiffs thus are entitled to summary judgment on their declaratory judgment Count I, and the court needn't consider any of plaintiffs' other claims or arguments. This result on Count I also means that plaintiffs deserve summary judgment against defendant AAC's counterclaim, which seeks a declaratory judgment that plaintiffs breached the policies by denying them coverage.

*Two*, plaintiffs seek rescission of the policies. Doc. 45 at 20 (Pretrial Order ¶ 4.a.ii.). But their Motion for Summary Judgment doesn't ask for rescission. In fact, plaintiffs' motion refers to rescission just once, telling the court it "need not reach the rescission issue . . . to hold that there is no coverage under these claims made Policies." Doc. 49 at 18 n.5. The court thus declines to decide whether plaintiffs are entitled to rescission because, quite simply, their Motion for Summary Judgment doesn't ask for it. So, plaintiffs' request to rescind the policies remains pending for trial.

V.     **Conclusion**

The court thus concludes that plaintiffs are entitled to a declaratory judgment that they have no duty to defend or indemnify AAC in the underlying lawsuit. Plaintiffs also are entitled

to judgment as a matter of law against defendant AAC's counterclaim.  The court grants plaintiffs' Motion for Summary Judgment (Doc. 48).  This conclusion renders plaintiffs' Motion for Partial Judgment on the Pleadings (Doc. 36) moot, so the court denies it.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Partial Judgment on the Pleadings (Doc. 36) is denied as moot.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion for Summary Judgment (Doc. 48) is granted.

**IT IS FURTHER ORDERED THAT** the court sets a status conference in the case for Friday, August 30, 2024, at 1:30 PM CST.

**IT IS SO ORDERED.**

**Dated this 30th day of July, 2024, at Kansas City, Kansas.**

                                              **s/ Daniel D. Crabtree**
                                              **Daniel D. Crabtree**
                                              **United States District Judge**